UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SUSAN B. LONG, et al., ) | **FILED** |
| ) | |
| Plaintiffs, ) | **SEP 0 8 2006** |
| ) | |
| v. ) | NANCY MAYER WHITTINGTON, CLERK |
| ) | U.S. DISTRICT COURT |
| UNITED STATES DEPARTMENT ) | |
| OF JUSTICE, ) | Civil Action No. 00-0211 (PLF) |
| ) | |
| Defendant. ) | |

| | |
|---|---|
| SUSAN B. LONG, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 02-2467 (PLF) |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF JUSTICE, ) | |
| ) | |
| Defendant. ) | |

OPINION

Plaintiffs Susan B. Long and David Burnham have filed the above-captioned

cases to challenge the responses of the United States Department of Justice to a series of requests

under the Freedom of Information Act, 5 U.S.C. § 552 et seq., for records from or relating to the

central case management databases of the Executive Office for United States Attorneys (the

"EOUSA"), a component of the Department of Justice. The consolidated cases are before the

Court for consideration of (1) two motions for partial summary judgment filed by plaintiffs in

Civil Action No. 00-0211 ("Long I"); (2) the Department's motion for summary judgment filed

in Long I; and (3) the parties' cross-motions for summary judgment filed in Civil Action

No. 02-2467 ("Long II"). Upon consideration of the arguments of the parties as set forth in their

voluminous briefs and at oral argument in Long I, the Court denies as moot plaintiffs' first

motion for partial summary judgment filed in Long I. The Court grants in part and denies in part

plaintiffs' second motion for partial summary judgement filed in Long I and plaintiffs' motion

for summary judgment filed in Long II. The Court also grants in part and denies in part the

Department's motions for summary judgment filed in both Long I and Long II.[1]

## I. BACKGROUND

### A. The Central Case Management Databases

Each of the 94 United States Attorney's Offices ("USAOs") maintains

computerized record-keeping systems for civil, criminal, and debt collection cases, and for

personnel resource matters. Defendant's Motion for Summary Judgment, filed in Long II, May

30, 2003 ("Def. Mot. (Long II)"), Declaration of Marie A. O'Rourke ("O'Rourke Decl.") ¶ 5.

Every month, computer programs maintained by the USAOs automatically extract certain pre-

determined fields of information from their computer databases and transmit the information

---

[1]     On March 30, 2006, the Court issued an Order to that effect with one caveat: the
Order erroneously indicated that plaintiffs' first motion for partial summary judgment filed in
Long I is granted in part and in all other respects is found to be moot. On September 25, 2001,
however, the Court effectively granted the motion in part when it directed the Department to
release all records that erroneously had been withheld and to file a Vaughn index on or before
October 15, 2001. See Order (Long I), Sept. 25, 2001, at 4. For the reasons stated in Part II.B of
this Opinion, the only unresolved issue in that motion is now moot. Accordingly, as indicated in
the Amended Order that accompanies this Opinion, plaintiffs' first motion for partial summary
judgment is denied as moot.

electronically to the EOUSA.  Id.  The EOUSA, in turn, uses the information it receives to

compile various centralized databases (the "central case management databases") that track the

work of each of the 94 USAOs.  Id.  For example, the central case management databases contain

information on matters such as how many and what types of criminal investigations various law

enforcement agencies have referred to USAOs for prosecution; the outcome of criminal

prosecutions (including sentences); and the types and results of civil actions brought by or

against federal agencies.

       The EOUSA uses the information contained in the central case management

databases to justify budget requests, allocate resources among USAOs, and produce management

reports.  O'Rourke Decl. ¶ 6.  The EOUSA also uses the information to produce numerous

periodicals and ad hoc reports for the Office of Management and Budget ("OMB"), the

Government Accountability Office ("GAO"), Congress, and various federal agencies and private

sector organizations.  Id.  The databases are updated on a monthly basis, and at the end of each

fiscal year information from the databases is used to produce the United States Attorneys'

Annual Statistical Report, which is made available to the public.  Id.

       At issue in these consolidated cases are the central case management databases

relating only to criminal, civil, and debt collection matters.[2]

------

[2]     Although plaintiffs also have requested records from the EOUSA's centralized
databases relating to personnel resource matters, the Department has produced the responsive
records from these databases in their entirety.  Hence, they are no longer at issue in this litigation.
See Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment and
in Support of Plaintiffs' Motion for Partial Summary Judgment on the Department's Revised
Exemption Claims, and Plaintiffs' Claims Concerning Notice of Delay and Fee Waiver, filed in
Long I, Aug. 5, 2002 ("Pl. Combined Mem. (Long I)") at 4 n.2.

1. Criminal and Civil Matters

The EOUSA compiles the information it receives from the USAOs related to

criminal and civil matters into a record-keeping system known as the "Central System." See

O'Rourke Decl. ¶ 5.[3] The information in the Central System currently is divided into five core

files: (1) the "criminal flagged master" file, which contains records pertaining to criminal cases

and investigations; (2) the "criminal immediate declination" file, which contains records of

criminal offenses for which federal prosecution immediately was declined by the USAOs upon

referral (requiring less than one hour of Assistant United States Attorney ("AUSA") time);

(3) the "criminal charge" or "central charge" file, which contains records of all criminal matters

that entered the prosecutorial phase; (4) the "civil flagged master" file, which contains records

pertaining to civil cases and investigations; and (5) the "civil immediate declination" file, which

contains records pertaining to requests for affirmative civil litigation that immediately were

declined by the USAOs upon referral (requiring less than one hour of AUSA time). See Def.

Mot. (Long II), Declaration of Siobahn E. Sperin ("Sperin Decl. (Long II)") ¶ 3.

The Central System also contains (1) criminal and civil "unflagged master" files,

which contain records from the "flagged master" files, but without certain added "flags" that

allow the EOUSA to analyze the data for statistical purposes; and (2) criminal and civil "delete

history" files, which are systems maintenance files that contain records that are no longer placed

---

[3]     The EOUSA has maintained centralized databases relating to criminal and civil
matters since 1974. The original record-keeping system used for these matters was known as the
Docketing and Reporting ("DNR") System, which was used from fiscal years 1974 through 1991.
The Central System has been utilized for these purposes since 1992. See Defendant's Motion for
Summary Judgment, filed in Long I, July 31, 2002 ("Def. Mot. (Long I)"), Declaration of John G.
Garvey ("Garvey Decl. (Long I)") ¶ 5.

in the master files because more than six successive months have elapsed since the EOUSA received a matching record from the relevant USAO.  See Sperin Decl. (Long II) ¶ 4.[4]

Each case or investigation appears within these files as a single "record."  Garvey Decl. (Long I) ¶ 8.  Each record, in turn, contains a set number of "fields" of information depending upon the type of file in which it appears.  See id.  For example, criminal flagged master records contain more than 100 fields, while the criminal charge records contain 13 fields.  See Def. Mot. (Long I), Exhibit O (Central System Vaughn Index).  The category of information contained in each field is pre-determined, and each field bears a label that generally relates to that category.  Examples include "defendant name," "criminal lead charge," "arrest date," "agency file number," and "court number."  See id.

### 2. Debt Collection Matters

The EOUSA compiles the information it receives from the USAOs related to debt collection matters into a record-keeping system known as the Transactional Informational Government Accounting System, or "TIGAS."  Def. Mot. (Long I), Declaration of Rhonda M. Price ("Price Decl.") ¶ 3.[5]  TIGAS, which is a "relational database," is structured somewhat differently from the Central System (and its predecessor, the DNR System).  In the DNR and Central Systems, which are "flat-file systems," the files are self-contained units, and information

---

[4]      The distinction between the "flagged" and "unflagged" criminal and civil master files is not relevant to the exemption claims at issue in these cases.

[5]      The EOUSA began to maintain a separate database for debt collection matters in 1980.  The original record-keeping system for these matters, which was used from fiscal years 1980 through 1985, was known as the DNR Collections System.  A slightly revised system, known as the Central Collections System, was used thereafter until the EOUSA began to use TIGAS in 1998.  See Garvey Decl. (Long I) ¶ 5.

from one file cannot be accessed from another file.  See Garvey Decl. (Long I) ¶ 3.[6]  In a

relational database, information is subdivided into tables, and connections or linkages can be

programmed between the tables, allowing the data maintained in one table to be related to the

data stored in another.  TIGAS data is stored in two tables: one contains 65 fields, and the other

contains 28 fields.  Each debt collection matter appears in TIGAS as a record and generally has

information stored in both tables.  See Price Decl. ¶ 5.

### B. Transactional Records Access Clearinghouse

Plaintiffs are co-directors of the Transactional Records Access Clearinghouse

("TRAC"), a nonprofit organization affiliated with Syracuse University.  TRAC compiles

information about the functioning of federal law enforcement and regulatory agencies, analyzes

the data, and publishes reports.  See Pl. Combined Mem. (Long I) at 5; Brief in Support of

Plaintiffs' Resubmitted Motion for Summary Judgment, filed in Long II, May 16, 2003 ("Pl.

Mem. (Long II)") at 2; TRAC website, available at http://trac.syr.edu/.  TRAC also makes data

compilations and tools for analyzing data available to others -- including Congress, journalists,

scholars, public interest organizations and other members of the public.  See Plaintiff's

Resubmitted Motion for Summary Judgment, filed in Long II, May 16, 2003 ("Pl. Mot. (Long

II)"), Declaration of Susan Long ("Long Decl. (Long II)") ¶ 4.  TRAC data and studies have been

cited by congressional leaders and news organizations in debates over gun control, tax policy,

---

[6]     The DNR Collections and Central Collections Systems are structured similarly to
the DNR and Central Systems, except that each of the collections systems contains only one file.
Within the file, each debt collection matter appears as a single record.  Each record has a set
number of fields, the subject of which is pre-determined (e.g., "debtor name," "social security
number," "street address," etc.).  See Garvey Decl. (Long I) ¶ 9.

immigration, terrorism, and similar law enforcement issues. See Pl. Mem. (Long II) at 2 & n.2, 4-5 (listing examples).

### C. The FOIA Requests at Issue

#### 1. Long I

Since 1989, TRAC has requested release of the EOUSA's central case management data under the FOIA. In response to past requests, the Department released to TRAC electronic copies of the data for fiscal years 1974 through 1997 but withheld various fields of information, thus giving rise to disputes between TRAC and the Department. See Plaintiffs' Motion for Partial Summary Judgment, Preliminary Injunction and Consolidation of Preliminary Hearing with Consideration of the Merits, filed in Long I, May 16, 2000 ("Pl. Mot. (Long I, 5/16/00)"), Declaration of Susan Long ("Long Decl. (Long I)") ¶ 3.[7] The disputes culminated in March 1998, when plaintiffs, on behalf of TRAC, sued the Department for the release of data from two of the USAOs that provide data to the EOUSA. See Long v. U.S. Dep't of Justice, No. 98-CV-370 (N.D.N.Y.).

In connection with that litigation, the Department was ordered, on July 7, 1998, to produce an index of the records and portions thereof that were withheld in accordance with Vaughn v. Rosen, 484 F.2d 820 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974) (a so-called "Vaughn index"). Long v. U.S. Dep't of Justice, 10 F. Supp. 2d 205, 209, 211 (N.D.N.Y. 1998). On June 17, 1999, the Department completed a Vaughn index listing all of the fields in the

---

[7]     TRAC also has requested and received – subject to certain redactions that plaintiffs do not challenge – all records pertaining to EOUSA procedures and standards for compiling, updating, and verifying the information in the central case management databases. See Pl. Combined Mem. (Long I) at 7 n.5.

databases at issue in that action, which includes all of the fields that comprise the Central System databases that are among those at issue in these consolidated cases. The June 1999 Vaughn index identifies certain fields of information that the Department concludes are exempt in whole or in part under Exemptions 6 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(6) and (7)(C), because of privacy concerns. See Long Decl. (Long I), Exhibit 15. No other FOIA exemptions are claimed in the index as a basis for the withholding.

By letter dated June 18, 1999, the head of the EOUSA informed counsel for TRAC that "[i]n response to future requests for case management system records, we intend to continue to release the fields agreed upon in the subject lawsuit [Long v. U.S. Dep't of Justice, No. 98-CV-370 (N.D.N.Y.)] as the appropriate ones under FOIA, absent unforeseen complications, errors or changes." Long Decl. (Long I), Exhibit 2. In October 1999, the EOUSA released to TRAC central case management data for fiscal year 1998 that had been processed in accordance with the exemptions identified in the June 1999 Vaughn index. See Long Decl. (Long I) ¶ 10. That same month, the EOUSA announced that it also would re-release the year-end data for fiscal years 1974 through 1997 – which TRAC previously had requested and received – in accordance with the exemption claims articulated in June 1999. See id. ¶ 11 & Exhibit 3. In other words, the EOUSA informed TRAC that it would release the data for those years to TRAC again, but with fewer redactions.

In addition to TRAC's prior requests for data for fiscal years 1974 through 1997, TRAC also had submitted a FOIA request on April 15, 1999 for central case management data

for the first six months of fiscal year 1999. See Long Decl. (Long I) ¶ 15 & Exhibit 1.[8]  By letter

dated October 29, 1999, the EOUSA informed TRAC that it would not release the requested

mid-year data for fiscal year 1999 until the year-end verification of the data was complete, on the

ground that "[i]nterim, draft data is unreliable and clearly falls within the definition of pre-

decisional/work product which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(5)."

Long Decl. (Long I), Exhibit 3.  Accordingly, on December 9, 1999, TRAC submitted a FOIA

request for the year-end data for fiscal year 1999, Long Decl. (Long I), Exhibit 7, and on

February 7, 2000, plaintiffs filed their initial complaint in Long I, challenging the Department's

exemption claim with respect to mid-year data.

By letter dated March 21, 2000 – six weeks after plaintiffs filed suit – the EOUSA

questioned whether TRAC qualified for a fee waiver, and requested that TRAC provide, among

other information, "any and all records for the previous five years regarding all fee schedules

utilized by TRAC, and any and all records of any fees proposed, charged and/or received by

TRAC in the previous five years."  Long Decl. (Long I), Exhibit 10.[9]  Then, on March 24, 2000,

the Department informed plaintiffs that it was developing new guidelines for the redaction of

records from its central case management databases and that the process would delay indefinitely

release of year-end data for fiscal years 1974 through 1997 and year-end data for fiscal year 1999.

Long Decl. (Long I), Exhibit 11.

---

[8]     In the April 15, 1999 FOIA request, as well as in other requests at issue in this
litigation, TRAC requested a full waiver of fees from the Department.

[9]     The March 21, 2000 letter also requested from TRAC "any and all records
regarding the sources of funding for TRAC" and "more detailed information and an explanation
of how TRAC contributes to the publics' [sic] benefit . . . ."  Long Decl. (Long I), Exhibit 10.

On April 11, 2000 -- at which time the Department still had not released any of the records requested by TRAC -- plaintiffs amended their complaint in <u>Long I</u> in order to challenge the EOUSA's decision to delay release of the year-end data for fiscal years 1974 through 1997 and fiscal year 1999. And on January 3, 2001, plaintiffs filed a second amended complaint, in part to include TRAC's request for the mid-year central case management data for fiscal year 2000, which TRAC submitted on April 3, 2000. <u>See</u> Long Decl. (<u>Long I</u>), Exhibit 12. As a result, the records at issue in <u>Long I</u> include (1) the year-end central case management data for fiscal years 1974-1997 and fiscal year 1999; and (2) the mid-year central case management data for fiscal years 1999 and 2000.

In addition to placing more records in issue, the second amended complaint also added two counts that are relevant to the motions presently being considered. The first such count relates to TRAC's request for the mid-year data for fiscal year 2000. With respect to this request, plaintiffs allege that the EOUSA has followed a pattern and practice of not meeting the deadlines prescribed by the FOIA and not providing TRAC with the notice required by the statute and regulations when it cannot process TRAC's requests within those deadlines. Second Amended Complaint (<u>Long I</u>), Fourth Count. The second added count relates to the EOUSA's processing of TRAC's fee waiver request. Plaintiffs allege that the EOUSA's request for records of TRAC's fee schedules and funding sources is unlawful, and that the EOUSA's failure to determine whether TRAC is entitled to a fee waiver is arbitrary and capricious. Second Amended Complaint (<u>Long I</u>), Fifth Count.

Shortly after filing their initial complaint in <u>Long I</u>, plaintiffs filed a motion for partial summary judgment seeking, in part, injunctive relief to require the Department to release

-10-

all database records and documentation to which an exemption under the FOIA does not apply.

See Pl. Mot. (Long I, 5/16/00). On September 25, 2001, this Court directed the Department to

release all records that erroneously had been withheld and to file a Vaughn index on or before

October 15, 2001. See Order (Long I), Sept. 25, 2001, at 4. In July 2002, after years of false

starts (dating back to June 1999), shifting positions, and error-filled productions of records and

submissions of summary judgment motions – three of which were withdrawn or stricken because

of errors, see Long v. U.S. Dep't of Justice, 207 F.R.D. 4, 5-6 (D.D.C. 2002) (denying motion for

leave to supplement motion for summary judgment and directing the Department to file corrected

motion) – the Department completed the "near-overwhelming project of responding to plaintiffs'

requests." Combined Memorandum of Points and Authorities in Support of Defendant's

Combined Motion for Summary Judgment and in Opposition to Plaintiffs' Partial Motion for

Summary Judgment, filed in Long I, July 31, 2002 ("Def. Combined Mem. (Long I, 7/31/02)")

at 3.

　　　According to the Department, the vast majority of data from approximately 25 million

records has been released, and only a small number of fields have been redacted. See Def.

Combined Mem. (Long I, 7/31/02) at 3. The Department submits that the redacted fields are

limited to names, street addresses, social security numbers, and other types of personal

information relating to the subjects of the case management records (or other information that

would enable the subjects to be identified); information about ongoing criminal investigations

that could enable the suspects to evade or obstruct law enforcement efforts; internal

administrative file numbers of no legitimate public interest; or information that could not

reasonably be segregated from the above. See id.

Plaintiffs, in fact, acknowledge that the Department "has come almost full circle" with respect to its exemption claims over the three-year-period between June 1999 and July 2002. Pl. Combined Mem. (Long I) at 8. For example, they concede that the Department's current position on the application of the FOIA to the central case management data for fiscal years 1974 through 1997 is identical to the position endorsed by the head of the EOUSA in June 1999. See id.[10] Plaintiffs further describe the Department's position with respect to the data for fiscal year 1999 and later periods as nearly identical to its June 1999 position. See id.

Nevertheless, several issues remain in dispute and are the subject of the parties' cross-motions for summary judgment in Long I. Specifically, plaintiffs challenge the Department's exemption claims for four categories of information the Department continues to withhold: (1) internal agency file numbers; (2) the names of litigants, court docket numbers, and cases captions in civil and criminal actions; (3) the names of properties, businesses, and other non-individual entities; and (4) the lead criminal charge in ongoing criminal investigations. The parties also have cross-moved on the following three legal claims: (1) whether the Department properly may withhold data until the end of the Department's fiscal year; (2) whether the Department provided TRAC with adequate notices under 5 U.S.C. § 552(a)(6) and 28 C.F.R.

---

[10]    Plaintiffs' concession, however, is accompanied with more than a hint of exasperation. They observe that "the three year delay from the end of the 1998-99 litigation until the Department released copies of the FY74-97 files in accordance with the position that it announced in that litigation illustrate[s] how an agency can thwart access to information that it has conceded is subject to release under the FOIA by recanting its concession and asserting meritless exemption claims." Pl. Combined Mem. (Long I) at 9.

§ 16.5; and (3) whether the Department acted appropriately in its consideration of TRAC's fee

waiver request.[11]

## 2. Long II

In April 2002, TRAC began to request central case management data from the

EOUSA on a monthly basis. See O'Rourke Decl. ¶¶ 9-18. As noted above, prior to that time

TRAC generally had requested mid-year or fiscal year data. By letter dated April 1, 2002,

however, TRAC requested four files from the EOUSA's Central System containing data covering

only the month of March 2002. The four files TRAC requested were the criminal flagged master,

criminal immediate declination, criminal charge, and civil flagged master files. See id. ¶ 10. By

letter dated May 1, 2002, TRAC requested the same four files containing data covering the

month of April 2002. See id. ¶ 11. Within a few months of TRAC's requests, the EOUSA

released the March and April 2002 data, redacted in accordance with the Vaughn index filed in

Long I.

By letter dated June 4, 2002, TRAC requested six files from the EOUSA's Central

System containing data covering the month of May 2002. In addition to the four files requested

in March and April 2002, TRAC also requested the criminal and civil delete history files. See

O'Rourke Decl. ¶ 14. Subsequently, in three separate FOIA requests, TRAC requested the same

six files containing data covering the months of June, July, and August 2002. See id. ¶¶ 15-17.

On September 17, 2002, the EOUSA notified TRAC that there would be a delay

in the release of the data for May 2002 and subsequent months so that the EOUSA could

---

[11]     Importantly, plaintiffs do not challenge the adequacy of the Department's search
for records responsive to TRAC's FOIA requests. See Pl. Combined Mem. (Long I) at 8.

undertake a thorough review "as to whether the release of information within the Central System could compromise national security or jeopardize the Department's anti-terrorism efforts." O'Rourke Decl., Exhibit 1. Then on October 29, 2002, the EOUSA notified TRAC of its final agency determination that, among other things, the continued release of information contained in the "program category" field from records of ongoing criminal investigations could reasonably be expected to interfere with the Department's law enforcement efforts. See id., Exhibit 2.[12] More specifically, the EOUSA informed TRAC that it would not release the "program category" field from the records that pertain to ongoing criminal investigations in the criminal flagged master, criminal unflagged master, and criminal delete history files for May 2002 and subsequent months. See id.[13]

By December 10, 2002, the EOUSA had released all six Central System files that TRAC had requested containing data from May through August 2002. See O'Rourke Decl. ¶ 26. Other than the redactions of the "program category" fields from records of ongoing criminal investigations in the criminal flagged master, criminal unflagged master, and criminal delete history files, the materials were redacted in accordance with the Vaughn index filed in Long I.

On December 16, 2002, plaintiffs filed their complaint in Long II to challenge the Department's decision to withhold certain "program category" information from data compiled

---

[12]     As described in greater detail below, the "program category" field contains approximately 90 codes that identify, with varying degrees of specificity, the type of criminal action that is the subject of an investigation or prosecution. See O'Rourke Decl. ¶ 33, Exhibit 4.

[13]     None of the FOIA requests at issue in Long I were affected by this redaction decision.

in May 2002 and later months. On May 12, 2003, the Court granted plaintiffs' motion to consolidate the cases.

## II. DISCUSSION

### A. The Freedom of Information Act

The fundamental purpose of the FOIA is to assist citizens in discovering "what their government is up to." U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 773 (1989). The FOIA therefore strongly favors openness, since Congress recognized in enacting it that an informed citizenry is "vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 242 (1978); see also Dep't of the Air Force v. Rose, 425 U.S. 352, 360 (1976) (purpose of the FOIA is "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny"). As such, "the Act is broadly conceived," EPA v. Mink, 410 U.S. 73, 79-80 (1973), and "disclosure, not secrecy, is the dominant objective of the Act." Dep't of the Air Force v. Rose, 425 U.S. at 361.

Under the FOIA, an agency may withhold documents responsive to a FOIA request only if the responsive documents fall within one of nine enumerated statutory exemptions. See 5 U.S.C. § 552(b). Consistent with the Act's "goal of broad disclosure, these exemptions have been consistently given a narrow compass," U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 151 (1989), and there is a "strong presumption in favor of disclosure." U.S. Dep't of State v. Ray, 502 U.S. 164, 173 (1991). The agency bears the burden of justifying any withholding, and the Court reviews the agency claims of exemption de novo. See 5 U.S.C.

§ 552(a)(4)(B); see also U.S. Dep't of State v. Ray, 502 U.S. at 173-74; Assassination Archives and Research Ctr. v. CIA, 334 F.3d 55, 57 (D.C. Cir. 2003); Summers v. Dep't of Justice, 140 F.3d 1077, 1079-80 (D.C. Cir. 1998).  To enable the Court to determine whether documents properly were withheld, the agency must provide a detailed description of the information withheld through the submission of a so-called "Vaughn index," sufficiently detailed affidavits or declarations, or both.  See Oglesby v. U.S. Dep't of the Army, 79 F.3d 1172, 1178 (D.C. Cir. 1996); Vaughn v. Rosen, 484 F.2d 820, 827-28 (D.C. Cir. 1973), cert. denied, 415 U.S. 977 (1974).

Furthermore, the FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b). This comports with the policy of disclosure and prevents the withholding of entire documents, see Billington v. U.S. Dep't of Justice, 233 F.3d 581, 586 (D.C. Cir. 2000), unless the agency can demonstrate that the non-exempt portions of a document are "inextricably intertwined with exempt portions." Trans-Pacific Policing Agreement v. U.S. Customs Serv., 177 F.3d 1022, 1027 (D.C. Cir. 1999) (quoting Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977)).  To withhold the entirety of a document, the agency must demonstrate that it cannot segregate the exempt material from the non-exempt and disclose as much as possible. See Kimberlin v. Dep't of Justice, 139 F.3d 944, 949-50 (D.C. Cir. 1998).

The Court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits or declarations, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322 (1986). In a FOIA case, the Court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations when the affidavits or declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); see also Vaughn v. Rosen, 484 F.2d at 826-28. Agency affidavits or declarations must be "relatively detailed and non-conclusory." SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C. Cir. 1991). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.' " Id. (internal citation and quotation omitted). An agency must demonstrate that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements." Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and quotation omitted).

## B. Exemption 2

Exemption 2 of the FOIA protects from mandatory disclosure records "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). To fall within Exemption 2, the material withheld must be "used for predominantly internal purposes." Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992) (quoting Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073 (D.C. Cir. 1981) (en banc)). If the threshold test of predominant internality is met, an agency may withhold the material "by proving that either

(1) disclosure may risk circumvention of agency regulation, or (2) the material relates to trivial administrative matters of no genuine public interest." Schwaner v. Dep't of the Air Force, 898 F.2d 793, 794 (D.C. Cir. 1990) (internal quotation marks and citations omitted). Predominantly internal records the disclosure of which would risk circumvention of agency statutes or regulations are protected by the so-called "high 2" exemption. Schiller v. NLRB, 964 F.2d at 1207. Predominantly internal records that deal with trivial administrative matters fall under the "low 2" exemption. Id.

Invoking the "low 2" exemption, the Department has withheld certain database fields that contain the file numbers assigned by the agencies that have referred matters to USAOs. These fields include the "investigative agency number" and "program agency file number" in the criminal flagged master, criminal unflagged master, and criminal delete files; "agency file number" in the criminal immediate declination file; "agency file number" in the civil flagged master, civil unflagged master, and civil delete files; "agency file number" in the civil immediate declination file; "agency number/social security number" in the civil immediate declination test files; "agency number" in the TIGAS records; and "agency file number" in the Central and DNR Collections records. See Def. Combined Mem. (Long I, 7/31/02) at 48-49; Def. Mot. (Long I), Declaration of Teresa Davis ("Davis Decl.") ¶ 113. The Department submits that the file numbers are used by the law enforcement agencies involved in the cases or investigations to which the records pertain as part of their internal administrative case tracking systems. See Def. Combined Mem. (Long I, 7/31/02) at 50; Davis Decl. ¶ 113.

In support of its exemption claim, the Department lists several decisions where courts have held or otherwise indicated that file numbers and other internal identification systems

-18-

are predominantly internal records that fall squarely within the category of information protected

from disclosure under the "low 2" exemption.  See Def. Combined Mem. (Long I, 7/31/02) at 50

(citing cases); Defendant's Combined Opposition to Plaintiffs' Motion for Partial Summary

Judgment/Reply to Plaintiffs' Opposition to Defendant's Motion for Summary Judgment, filed in

Long I, Sept. 9, 2002 ("Def. Combined Mem. (Long I, 9/9/02)") at 44 (citing cases).  The

Department further submits that the rationale behind the "low 2" exemption is that trivial

administrative details generally do not elucidate what the government is doing substantively and

that an agency therefore should not be required to incur the burden of locating, assembling, and

producing records that do not shed any light on the agency's performance of its duties.  See id. at

51.  It follows, the Department continues, that when releasing "low 2" exempt information would

not pose any significant burden on an agency, the agency may exercise its discretion to waive the

exemption and release the information.  See id. (citing Fonda v. CIA, 434 F. Supp. 498, 503

(D.D.C. 1977)).

        With respect to many of the fields in the central case management databases that

contain internal administrative numbers, the Department in fact has exercised such discretion and

has released the fields.  See id.; Def. Combined Mem. (Long I, 9/9/02) at 47.  With respect to the

fields it has withheld, however, the Department contends that releasing them would pose a

significant burden on the Department.  That is because in at least some of the records at issue the

withheld fields contain the names or social security numbers of individuals associated with the

records or contact information for law enforcement agents – information the Department

maintains is exempt from disclosure under Exemption 6 and, in some instances, under

Exemption 7(C) as well.  See Def. Mot. (Long I), Declaration of Jeffrey D. Rupert ("Rupert Decl.

-19-

(Long I)") ¶¶ 9, 10; Declaration of Laurie Hamilton ("Hamilton Decl.") ¶ 18; Davis Decl.

¶ 113.[14] Therefore, in order to release these fields, the Department would have to incur the

substantial burden of segregating the fields that contain such privacy-protected information from

those that do not. See Def. Combined Mem. (Long I, 7/31/02) at 51; Def. Combined Mem.

(Long I, 9/9/02) at 47.

Plaintiffs respond that the withheld file numbers do not fall within the scope of

Exemption 2 for two reasons: (1) they do not meet the threshold requirement of relating to

internal personnel rules and practices; and (2) there is a public interest in their disclosure. See Pl.

Combined Mem. (Long I) at 43-45. In support of their first argument, plaintiffs rely primarily on

Schwaner v. Dep't of the Air Force, 898 F.2d 793 (D.C. Cir. 1990). According to plaintiffs, the

court in Schwaner rejected the claim that Exemption 2 allows the government to withhold

information solely on the basis that it is "trivial and internal." Pl. Combined Mem. (Long I) at 44

(citing Schwaner v. Dep't of the Air Force, 898 F.2d at 795-96, 797). Instead, relying in part on

Jordan v. U.S. Dep't of Justice, 591 F.2d 753 (D.C. Cir. 1978) (en banc), plaintiffs contend that

the exemption is limited to information that relates to the internal personnel rules and the internal

personnel practices of an agency. See Reply in Support of Plaintiffs' Motion for Partial

Summary Judgment on the Department's Revised Exemption Claims, and Its Claims Concerning

Notice of Delay and Fee Waiver, filed in Long I, Oct. 2, 2002 ("Pl. Reply (Long I, 10/2/02)") at

24 (citing Jordan v. U.S. Dep't of Justice, 591 F.2d at 764 (statutory term "internal personnel"

---

[14]     The Department describes the agency file number fields as "discretionary" fields
into which USAOs are not required to input any information. See Def. Combined Mem. (Long I,
7/31/02) at 48. Some USAOs nevertheless input names, social security numbers, and telephone
numbers into the fields. See id. at 51.

modifies both "rules" and "practices")). Because, in plaintiffs' estimation, the agency file

numbers at issue do not relate to a personnel rule or practice, they do not qualify for Exemption 2

as a threshold matter.

Plaintiffs next argue that even if the agency file numbers satisfied the statutory

language, Exemption 2 still would not justify withholding them because of the legitimate public

interest in their disclosure. According to plaintiffs, the Department uses the agency file numbers

to reconcile its data with that of the referring agencies. See Pl. Combined Mem. (Long I) at 45.

Inasmuch as different agencies occasionally report inconsistent statistics regarding activities that

the agencies have in common, plaintiffs assert that the "agency file numbers allow researchers to

correlate data reported by different agencies and identify the reasons for these conflicting

reports." Id.; see also Pl. Mot. (Long I, 8/5/02), Second Declaration of David Burnham ("Second

Burnham Decl. (Long I)") ¶¶ 3-5; Declaration of Michael D. Maltz ("Maltz Decl. (Long I)") ¶¶ 8,

9, 12. Because agency data is used for budget and policy decisions, plaintiffs therefore argue that

there is a significant public interest in disclosure of the agency file numbers to researchers such

as TRAC. See Pl. Combined Mem. at 45.

Although a much closer call than the Department suggests, the Court concludes

that the Department properly has invoked Exemption 2 to withhold the file numbers at issue. On

the threshold question – i.e., whether the information withheld falls within the statutory language

– the D.C. Circuit has clarified that Exemption 2 broadly "applies to material 'used for

predominantly internal purposes.'" Schiller v. NLRB, 964 F.2d at 1207 (quoting Crooker v.

Bureau of Alcohol, Tobacco & Firearms, 670 F.2d at 1073); see also id. ("threshold test" is one

of "predominant internality"). The agency file numbers the Department has withheld, which are

used by agency personnel as part of their internal administrative case tracking systems, satisfy

that threshold requirement. See Schiller v. NLRB, 964 F.2d at 1207 (holding that

"recordkeeping directions" are "housekeeping matters appropriately withheld under exemption

2"); Changzhou Laosan Group v. U.S. Customs and Border Protection Bureau, Civil No. 04-

1919, 2005 WL 913268, at *3 (D.D.C. Apr. 20, 2005) (administrative markings, including file

numbers, "are clearly documents that are predominantly internal to the agency, or are sufficiently

related to a personnel rule or practice").

        Neither Jordan nor Schwaner supports the narrow construction of Exemption 2

advanced by plaintiffs. While they are correct that the court in Jordan construed the statutory

language of Exemption 2 strictly to cover only minor employment-related matters, they ignore

subsequent circuit authority repudiating the narrow construction announced in Jordan. For

example, the year immediately following Jordan, the court of appeals issued a decision in Cox v.

U.S. Dep't of Justice, 601 F.2d 1 (D.C. Cir. 1979), overruled on other grounds by Benavides v.

Bureau of Prisons, 993 F.2d 257 (D.C. Cir. 1993), in which it held that certain information

contained in the Manual for United States Marshals properly was withheld under Exemption 2

because the information relates:

> solely to housekeeping concerns of interest only to agency personnel.
> The undisclosed material does not purport to regulate activities
> among members of the public. Nor does it set standards to be
> followed by agency personnel in deciding whether to proceed against
> or take action affecting members of the public. Differently stated, the
> unreleased information is not "secret law," the primary target of [the
> FOIA's] broad disclosure provisions.

Cox v. U.S. Dep't of Justice, 601 F.2d at 5. Then in Lesar v. U.S. Dep't of Justice, 636 F.2d 472

(D.C. Cir. 1980), the court held that symbols used to refer to FBI informants in FBI documents

and records "plainly fall within the ambit of Exemption 2 . . . [as] a matter of [only] internal

significance" in which the public has no substantial interest. Id. at 485.

In Crooker, the D.C. Circuit, sitting en banc, noted that from the cases cited

above, "it is plain that there is some uncertainty in this circuit regarding the scope of Exemption

2." Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d at 1069; see also id. ("While

Cox purports to follow the analysis in Jordan, its result seems inconsistent with the rationale of

Jordan."). In affirming the judgment of the district court, which had held that portions of a

training manual for agents of the Bureau of Alcohol, Tobacco & Firearms were exempt under

Exemption 2, the court in Crooker expressly rejected the narrow construction of the statutory

language that had been adopted in Jordan. See Crooker v. Bureau of Alcohol, Tobacco &

Firearms, 670 F.2d at 1053, 1074, 1075.[15] According to the court:

> Although the majority opinion in Jordan stated that the language of
> Exemption 2 "would seem to refer to those rules and practices that
> concern the relations among the employees of an agency," 591 F.2d
> at 763, and that "personnel" "normally connote[s] matters relating to
> pay, pension, vacations, hours of work, lunch hours, parking, etc.,"
> id., we feel that the meaning of Exemption 2 is not so limited.

Id. at 1073 (emphasis added). Construing the statutory language more broadly, the court in

Crooker concluded that the proper threshold question under Exemption 2 is whether the material

relates to any rule or practice "governing agency personnel," id. at 1056, and "is used

---

[15]     While the court in Crooker repudiated the "rationale in Jordan," it did not disagree
with the judgment in that case. Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d at
1053, 1074.

predominantly for internal purposes," id. at 1073; see also id. at 1074; Schwaner v. Dep't of the

Air Force, 898 F.2d at 795; Schiller v. Nat'l Labor Relations Bd., 964 F.2d at 1207.[16]

Plaintiffs' reliance on Schwaner to support a narrow construction that would

exclude the contested file numbers from the scope of Exemption 2 also is misplaced. In

Schwaner, Judge Williams, writing for a divided panel, qualified the threshold test of

"predominant internailty" by emphasizing that information withheld under Exemption 2 must

relate in some meaningful way to a genuine rule or practice of an agency. See Schwaner v. Dep't

of the Air Force, 898 F.2d at 795-98.[17] Accordingly, the court held Exemption 2 inapplicable to

a list of names and duty addresses of Air Force personnel, which the Air Force maintained "for

purely internal convenience." Id. at 794; see also id. at 795-96 (noting that "the only 'practice' to

which the material is related is the practice of collecting data").[18] By contrast, the database

---

[16]     In Crooker, the court adopted a two-part test for evaluating Exemption 2 claims:
(1) whether the material meets the test of "predominant internality"; and (2) if so, whether
disclosure significantly would risk circumvention of agency regulations or statutes. See Crooker
v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d at 1074. Subsequently, the D.C. Circuit
has reformulated the second prong of the test to differentiate between "high 2" and "low 2"
exempt information, the latter of which applies to trivial administrative matters of no genuine
public interest. See, e.g., Founding Church of Scientology v. Smith, 721 F.2d 828, 830 n.4 (D.C.
Cir. 1983). The threshold test of "predominant internality," however, applies to both the "high
2" and "low 2" categories. See note 19, infra.

[17]     The Court finds significant that in Schwaner – as in several other court of appeals
decisions applying the principles set forth in Crooker – the court does not construe the statutory
term "personnel" as a limiting one. See, e.g., Founding Church of Scientology v. Smith, 721
F.2d at 830 n.2 ("Exemption 2 applies . . . to the internal personnel rules and to the internal
practices of an agency.") (quoting Jordan v. U.S. Dep't of Justice, 591 F.2d at 782 (Leventhal, J.,
concurring in result)).

[18]     In a dissenting opinion, Judge Revercomb, sitting by designation, stated that he
"cannot imagine a personnel practice by an agency more fundamental than obtaining and
compiling the names and addresses of its employees." Schwaner v. Dep't of the Air Force, 898
F.2d at 798 (Revercomb, J., dissenting).

-24-

records at issue here are maintained by the Department not merely for administrative convenience, but rather for the fundamental purpose of "track[ing] the caseload of the United States Attorney's Offices." Pl. Combined Mem. (<u>Long I</u>) at 1; <u>see also</u> O'Rourke Decl. ¶ 6. ("The EOUSA uses this information to justify budget requests, allocate resources among district offices, and produce management reports."). In other words, unlike compiling raw lists of names and addresses for no discernible purpose other than "purely internal convenience," compiling information to track an agency's performance of its core functions – which are carried out by agency personnel – is a quintessential agency practice. It follows that "the numbering system by which an agency controls the categorizing, retrieval, and dissemination of" such information, Def. Combined Mem. (<u>Long I</u>, 9/9/02) at 44, sufficiently relates to an agency practice within the meaning of Exemption 2.

Indeed, as the Department emphasizes, cases following <u>Schwaner</u> routinely include internal file or routing numbers as among the category of information that is exempt from disclosure under the "low 2" exemption. <u>See</u>, <u>e.g.</u>, <u>Dipietro v. Executive Office for U.S. Attorneys</u>, 368 F. Supp. 2d 80, 82 (D.D.C. 2005); <u>Changzhou Laosan Group v. U.S. Customs and Border Protection Bureau</u>, 2005 WL 913268, at *3; <u>Judicial Watch, Inc. v. U.S. Dep't of Commerce</u>, 83 F. Supp. 2d 105, 109 (D.D.C. 1999); <u>Coleman v. FBI</u>, 13 F. Supp. 2d 75, 78 (D.D.C. 1998); <u>cf</u>. <u>Schiller v. NLRB</u>, 964 F.2d at 1207 (holding that "recordkeeping directions" are "housekeeping matters appropriately withheld under exemption 2"); <u>but see</u> <u>Fitzgibbon v. U.S. Secret Serv.</u>, 747 F. Supp. 51, 56 (D.D.C. 1990) (internal identifications and markings are

not covered by Exemption 2).[19]  While the Court can conceive of situations where agency file numbers would not qualify for consideration under Exemption 2, the Court finds that the agency numbers at issue here do.

Moving to the second part of the analysis, the Court also finds that plaintiffs have failed to demonstrate a genuine public interest that would be served by disclosure.  For example, although plaintiffs assert that release of the agency file numbers will help them and other researchers to identify the reasons for certain discrepancies in agency statistics, the Court – without addressing whether plaintiffs' asserted interest even constitutes a genuine public interest – agrees with the Department that plaintiffs' submissions insufficiently demonstrate how access to the withheld information would assist them in achieving this goal.  In any event, whatever limited public interest in disclosure that may exist is outweighed by the government's interest in avoiding the significant burden involved in collecting and evaluating this information for release – namely, locating and redacting the privacy-protected information that is scattered throughout

---

[19]     Even more routinely, courts have held that certain internal agency file numbers, such as those that identify informants or other law enforcement sources, are exempt from disclosure under the "high 2" exemption.  See, e.g., Lesar v. U.S. Dep't of Justice, 636 F.2d at 485-86; Voinche v. FBI, 46 F. Supp. 2d 26, 30 (D.D.C. 1999).  Although plaintiffs attempt to distinguish such cases on the ground that they involve "codes that shed light on sensitive personnel practices," Pl. Combined Mem. (Long I) at 45, they do not cite, and the Court has not located, any authority for the proposition that an agency may withhold information relating to sensitive agency practices under Exemption 2 without first showing that the information is used for predominantly internal purposes.  To be sure, in Schwaner, the court observed that "[j]udicial willingness to sanction a weak relation to 'rules and practices' may be greatest when the asserted government interest is relatively weighty."  Schwaner v. Dep't of the Air Force, 898 F.2d at 796.  But here the Department has asserted an interest in not having to incur the substantial burden of assembling the information for release, which is not only a legitimate government interest but precisely the "general thrust of the exemption."  Dep't of the Air Force v. Rose, 425 U.S. at 369.

the relevant database fields. See Def. Combined Mem. (Long I, 7/31/02) at 51; Def. Combined

Mem. (Long I, 9/9/02) at 47.

Accordingly, for the reasons stated, the Court concludes that the Department

properly has withheld the agency file numbers under the "low 2" exemption.

### C. Exemption 5

Exemption 5 of the FOIA excludes from disclosure any documents that are "inter-

agency or intra-agency memorandums or letters which would not be available by law to a party

other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This provision

protects from disclosure those documents traditionally afforded protection "pursuant to

evidentiary privileges in the civil discovery context," including those covered by the attorney-

client, attorney work product, and deliberative process privileges. Dow Jones & Co. v. Dep't of

Justice, 917 F.2d 571, 573 (D.C. Cir. 1990) (quoting Formaldehyde Inst. v. Dep't of Health and

Human Servs., 889 F.2d 1118, 1121 (D.C. Cir. 1989) (internal quotation marks omitted)). In

keeping with the FOIA's general goal of broad disclosure, Exemption 5 is construed narrowly,

Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001), and the

burden is on the agency invoking Exemption 5 to "establish[] its right to withhold evidence from

the public . . . . [C]onclusory assertions of privilege will not suffice to carry" the agency's

burden. Senate of the Commonwealth of Puerto Rico v. U.S. Dep't of Justice, 823 F.2d 574, 585

(D.C. Cir. 1987) (quoting Coastal States Gas Corp. V. Dep't of Energy, 617 F.2d 854, 861 (D.C.

Cir. 1980)).

-27-

As noted above, on April 15, 1999, TRAC submitted a FOIA request for central case management data for the first six months of fiscal year 1999. See Long Decl. (Long I) ¶ 15 & Exhibit 1. By letter dated October 29, 1999, the EOUSA informed TRAC that it would not release the requested mid-year data for fiscal year 1999 until the year-end verification of the data was complete, on the ground that "[i]nterim, draft data is unreliable and clearly falls within the definition of pre-decisional/work product which is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(5)." Long Decl. (Long I), Exhibit 3. On February 7, 2000, plaintiffs filed their initial complaint in Long I, challenging the Department's exemption claim with respect to mid-year data, and on May 16, 2000, they filed a motion for partial summary judgment seeking, in part, judgment against the Department's claim that Exemption 5 of the FOIA permits the Department to withhold database entries in their entirety prior to year-end verification. See Pl. Mot. (Long I, 5/16/00) at 1, 2. According to plaintiffs, the Department's Exemption 5 claim is foreclosed as a matter of law by Petroleum Info. Corp. v. U.S. Dep't of the Interior, 976 F.2d 1429 (D.C. Cir. 1992). See Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment and Preliminary Injunctive Relief, filed in Long I, May 16, 2000 ("Pl. Mem. (Long I)") at 20-21. In that decision, the court held that an agency could not withhold certain database records on the ground that correcting errors was a privileged deliberative process protected by Exemption 5. See Petroleum Info. Corp. v. U.S. Dep't of the Interior, 976 F.2d at 1439.

The Department argues that plaintiffs' claim now is moot because the Department no longer is asserting that data is exempt from disclosure prior to year-end verification and has released the records in question. According to the Department, the D.C. Circuit "has held unequivocally that the agency's release of a document after having earlier claimed that the

-28-

document was exempt 'moots the question of the validity of the original exemption claim.'"

Def. Combined Mem. (Long I, 7/31/02) at 36 (quoting Armstrong v. Executive Office of the

President, 97 F.3d 575, 582 (D.C. Cir. 1996)); see also id. at 34 (citing cases). Although

acknowledging that there is an exception to the above-stated principle "for cases in which an

agency has followed a 'policy or practice' of withholding, and the plaintiff seeks an injunction

against application of that policy or practice 'in the future,'" see id. at 35 (quoting Payne Enters.,

Inc. v. United States, 837 F.2d 486, 491 (D.C. Cir. 1988)), the Department contends that there is

no evidence in the record to establish such a policy or practice on the part of the Department, see

id. at 35-36. Specifically, the Department submits that prior to October 29, 1999, the "EOUSA

has no record of ever having . . . denied a FOIA request for mid-year data on the grounds that it

was categorically exempt from disclosure" under Exemption 5. Id. at 35; see also Davis Decl.

¶ 15.

        Plaintiffs reply with two arguments. First, they contend that, contrary to the

Department's assertion otherwise, the D.C. Circuit has not established "a special mootness

doctrine for FOIA actions." Reply to Defendant's July 31, 2002 Opposition to Plaintiffs' Motion

for Partial Summary Judgment, filed in Long I, Aug. 1, 2002 ("Pl. Reply (Long I, 8/1/02)") at 5.

Plaintiffs argue that courts long have recognized that an agency's decision to voluntarily abandon

a legal position after being challenged does not render the challenge moot if the agency may

assert the same claim against the plaintiffs in the future, see id. at 4 (citing Friends of the Earth,

Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 189 (2000); City of New York v. Baker, 878 F.2d

507, 511-12 (D.C. Cir. 1989)), and that the D.C. Circuit has applied the principles underlying the

"voluntary cessation" doctrine to FOIA cases. See id. at 5 (citing Payne Enters., Inc. v. United

States, 837 F.2d 486 (D.C. Cir. 1988); Better Gov't Ass'n v. Dep't of State, 780 F.2d 86 (D.C. Cir. 1986)). Plaintiffs further assert that the cases cited by the Department suggesting a "unique rule for FOIA actions" are inapposite "because none of the cases involve situations in which the requester planned to continue to submit FOIA requests that could be subject to the same exemption claim." Id. at 5-6.

Second, relying again on Payne Enterprises and Better Government, plaintiffs argue that the Department's claim that a FOIA requester must suffer more than one denial before the voluntary cessation doctrine applies is without merit. See Pl. Reply (Long I, 8/1/02) at 7. In any event, they contend that "the record shows that withholding interim data from plaintiffs was not an isolated incident, but the result of a position repeatedly reiterated by the Department over the course of several years." Id. Specifically, in addition to the October 1999 denial letter, they point to several oral representations made by EOUSA personnel to plaintiff Long dating back to at least 1993. See Third Declaration of Susan Long, filed in Long I, May 10, 2001, ¶ 34. Plaintiffs also emphasize that in its submissions to the Court, "the Department has not even attempted to show that the EOUSA will not respond to [future requests for interim data] by interposing its Exemption 5 claim again to deny or delay the release of the data to Plaintiffs." Pl. Reply (Long I, 8/1/02) at 5.

The Court agrees with the Department that the question of whether Exemption 5 applies to interim data that already has been released to plaintiffs is moot. As a general proposition, "however fitful or delayed the release of information under the FOIA may be," once an agency has released all nonexempt material, the courts "have no further judicial function to perform under the FOIA." Tijerina v. Walters, 821 F.2d 789, 799 (D.C. Cir. 1987) (quoting

Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982)); see also Crooker v. U.S. State Dep't, 628

F.2d 9, 10 (D.C. Cir. 1980) ("[O]nce the records are produced the substance of the controversy

disappears and becomes moot since the disclosure which the suit seeks has already been made.").

Moreover, the record does not establish a "policy or practice" on the part of the Department that

will impair TRAC's access to interim data in the future.  To the contrary, the record demonstrates

that TRAC has requested and the Department has released interim data on multiple occasions

subsequent to the Department's lone denial of such a request.  See O'Rourke Decl. ¶¶ 9-26.

      The D.C. Circuit's decision in Payne Enterprises provides no support for

plaintiffs' contention that the controversy between the parties regarding interim data is a live one.

In that case, the court emphasized that the agency had conceded both that it was following an

"impermissible practice" in evaluating FOIA requests and that the requester would suffer a

"continuing injury due to this practice." Payne Enters., Inc. v. United States, 837 F.2d at 491

(footnote omitted).  Here, the Department vigorously challenges any such assertions and has

submitted evidence to the contrary.  Plaintiffs' reliance on Better Government also misses the

mark.  The FOIA requesters in that case – frequent requesters like TRAC – challenged the

validity of Justice Department guidelines and an Interior Department regulation – both of which

were applied by the agencies to evaluate FOIA fee waiver requests.  See Better Gov't Ass'n v.

Dep't of State, 780 F.2d at 88.  Although they had been granted fee waivers for the specific FOIA

requests at issue in the case – having initially been denied such waivers – the court nevertheless

held that their arguments regarding the facial validity of the guidelines and regulation were not

moot.  Id. at 91.  The dispositive issue for the court, however, was that "the Government clearly

intends to apply these purportedly objectionable standards to FOIA requests in the future." Id.

Here, plaintiffs are not challenging the standards by which the Department evaluates FOIA

requests, and there is no indication that the Department intends to assert unsupported Exemption

5 claims in the future. Plaintiffs instead are challenging the application of a <u>specific</u> FOIA

exemption to <u>specific</u> records in the context of a <u>specific</u> FOIA request.

In this regard, the court's decision in <u>Better Government</u> not only fails to support

plaintiffs' position but actually forecloses it. Because the requesters in that case had been

granted fee waivers for the specific FOIA requests at issue, the court held that:

> the appellants' challenge to the standards <u>as applied to their specific
> fee waiver requests</u> is, in fact, moot. Even assuming appellants'
> claims that they were improperly denied fee waivers were well-
> founded, we cannot order the appellee departments to do something
> they already have done, <u>i.e.</u>, waive the FOIA fees in the instant cases.
> As to this issue, [the appellants] "'ha[ve] obtained everything that
> [they] could recover . . . by a judgment of this court in their favor.'"
> The appellants apparently seek a declaration from this court that the
> initial refusals to waive FOIA fees were unlawful; however, such a
> declaration would be an advisory opinion which federal courts may
> not provide.

<u>Better Gov't Ass'n v. Dep't of State</u>, 780 F.2d at 91 (emphasis in original; footnotes omitted).

Here too, the Court cannot order the Department to do something it already has done – namely,

release interim data. Here too, as well, any declaration regarding the application of Exemption 5

to interim data that the Department already has released would be an impermissible advisory

opinion. <u>See Long v. Bureau of Alcohol, Tobacco and Firearms</u>, 964 F. Supp. 494, 497 (D.D.C.

1997) ("Plaintiffs cannot evade the mootness of their claim by requesting a declaratory

judgment.").

Accordingly, for the reasons stated, the Court concludes that plaintiffs' claims

regarding interim data are moot.

### D. Exemptions 6 and 7(C)

Exemption 6 of the FOIA permits the government to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Under this provision, the threshold question is whether the requested information is contained in personnel, medical or "similar" files. See U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 600 (1982) ("[T]he phrase 'similar files' was to have a broad, rather than a narrow meaning."); see also Horowitz v. Peace Corps, 428 F.3d 271, 277 (D.C. Cir. 2005); Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 32 (D.C. Cir. 2002); Billington v. U.S. Dep't of Justice, 233 F.3d at 586; Ripskis v. Dep't of Hous. and Urban Dev., 746 F.2d 1, 3 (D.C. Cir. 1984). If the information sought is contained in such files, the Court must assess "whether the information is of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d at 32 (citing U.S. Dep't of State v. Washington Post Co., 456 U.S. at 598; New York Times Co. v. NASA, 920 F.2d 1002, 1004 (D.C. Cir. 1990) (en banc)).

To determine what constitutes a "clearly unwarranted privacy invasion," the Court must balance the individual's interest in privacy against the public interest in disclosure, keeping at the forefront the FOIA's "basic policy of opening agency action to the light of public scrutiny." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d at 32 (quoting U.S. Dep't of State v. Ray, 502 U.S. at 175 (internal quotation marks omitted)). The "public interest" inquiry is whether disclosure would "contribute significantly to public understanding of the operations or activities of government." U.S. Dep't of Defense v. Fed. Labor Relations Auth., 510 U.S. 487, 495 (1994)

(quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. at 775);

see Horowitz v. Peace Corps, 428 F.3d at 278.  Throughout this analysis, the burden remains on

the government to justify any withholdings, since "under Exemption 6, the presumption in favor

of disclosure is as strong as can be found anywhere under the Act." Nat'l Ass'n of Home

Builders v. Norton, 309 F.3d at 32 (quoting Washington Post Co. v. U.S. Dep't of Health and

Human Servs., 690 F.2d 252, 261 (D.C. Cir. 1982)); see also Ripskis v. Dep't of Hous. and

Urban Dev., 746 F.2d at 3 ("[T]he 'clearly unwarranted' language of Exemption 6 weighs the

scales in favor of disclosure.").

Exemption 7(C) of the FOIA protects from mandatory disclosure "records

compiled for law enforcement purposes" to the extent that disclosure "could reasonably be

expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 522(b)(7)(C).

The threshold question under this provision is whether the information requested is contained in

"records that have been compiled for law enforcement purposes." Id.; Quinon v. FBI, 86 F.3d

1222, 1228 (D.C. Cir. 1996).[20]  If the information sought is contained in such files, the Court

must assess whether disclosure "could reasonably be expected to constitute an unwarranted

invasion of personal privacy." Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 165,

171 (2004).

As with Exemption 6, in determining whether Exemption 7(C) applies to

particular material, the Court must balance the interest in privacy of the individual mentioned in

---

[20]    The Department maintains that "records of cases in which the government is in
the role of prosecutor or plaintiff" constitute "records that have been compiled for law
enforcement purposes" within the meaning of 5 U.S.C. § 552(b)(7).  Def. Combined Mem. (Long
I, 7/31/02) at 31.  Plaintiffs do not contest this assertion.

the record against the public's interest in disclosure. See Beck v. Dep't of Justice, 997 F.2d 1489, 1491 (D.C. Cir. 1993); Stern v. FBI, 737 F.2d 84, 91 (D.C. Cir. 1984). It is the "interest of the general public, and not that of the private litigant" that the Court considers in this analysis. Brown v. FBI, 658 F.2d 71, 75 (2d Cir. 1981) (citing Ditlow v. Shultz, 517 F.2d 166, 171-72 (D.C. Cir. 1975)). "[T]he only public interest relevant for purposes of Exemption 7(C) is one that focuses 'on the citizens' right to be informed about what their government is up to.'" Davis v. U.S. Dep't of Justice, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (quoting U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. at 773).

Furthermore, while acknowledging that the Supreme Court has construed Exemption 7(C) to be "somewhat broader" than Exemption 6, Nat'l Archives & Records Admin. v. Favish, 541 U.S. at 165-66; U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. at 756, the D.C. Circuit "has deemed the privacy inquiry of Exemptions 6 and 7(C) to be essentially the same." Judicial Watch, Inc. v. Dep't of Justice, 365 F.3d 1108, 1125 (D.C. Cir. 2004) (citing Reed v. NLRB, 927 F.2d 1249, 1251 (D.C. Cir. 1991); Nat'l Ass'n of Retired Fed. Employees v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989)); see also Beck v. Dep't of Justice, 997 F.2d at 1491. Thus, "the difference between the standards for the two exemptions 'is of little interest' except when analyzing 'the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions.'" Horowitz v. Peace Corps, 428 F.3d at 279 n.2 (quoting U.S. Dep't of Def. v. Fed. Labor Relations Auth., 510 U.S. 487, 496 n.6 (1994)).[21]

---

[21]     The Supreme Court has put it this way:

Records or information are not to be released under FOIA if

The Department has withheld certain fields on the ground that release of the

information contained therein "would generally reveal private information about the subject of a

case management record (i.e., the defendant, litigant, suspect, etc.)." Def. Combined Mem.

(Long I, 7/31/02) at 39. Specifically, the Department has withheld the following fields:

"defendant name" in the criminal flagged master, criminal unflagged master, and criminal delete

history files; "suspect" and "social security number" in the criminal immediate declination file;

"litigant name" in the civil flagged master, civil unflagged master, and civil delete history files;

"name" in the civil immediate declination file; "name" and "agency number/social security

number" in the civil immediate declination test file; "name_first," "name_last," "social security

number," and "address_1" in the TIGAS database; "debtor last name," "debtor first name,"

"SSN," and "street" in the Central Collections database; and "debtor name," "debtor last name,"

"debtor first name," "SSN," and "street" in the DNR Collections database. See id.; Davis Decl.

¶ 94.

---

> disclosure "could reasonably be expected to constitute an
> unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7).
> This provision is in marked contrast to the language in Exemption 6,
> pertaining to "personnel and medical files," where withholding is
> required only if disclosure "would constitute a clearly unwarranted
> invasion of personal privacy." § 552(b)(6). The adverb "clearly,"
> found in Exemption 6, is not used in Exemption 7(C). In addition,
> "whereas Exemption 6 refers to disclosures that 'would constitute' an
> invasion of privacy, Exemption 7(C) encompasses any disclosure that
> 'could reasonably be expected to constitute' such an invasion."
> Reporters Committee, 489 U.S. at 756. Exemption 7(C)'s
> comparative breadth is no mere accident in drafting. We know
> Congress gave special consideration to the language in Exemption
> 7(C) because it was the result of specific amendments to an existing
> statute.

Nat'l Archives & Records Admin. v. Favish, 541 U.S. at 165-66.

The Department also has withheld certain fields that identify "specific litigation" on the ground that "the identity of the defendant/litigant/suspect can be readily ascertained" from such information. Def. Combined Mem. (Long I, 7/31/02) at 39. In other words, the Department argues that the release of these fields "indirectly" would identify the subject of the record. Id. at 43. Within this category, the Department has withheld the "court number" and "file name" fields in the criminal flagged master, criminal unflagged master, criminal delete history, civil flagged master, civil unflagged master, and civil delete history files, and the "court number" fields in the TIGAS, Central Collections, and DNR Collections databases. See id. at 39-40; Davis Decl. ¶ 94.[22] According to the Department, all of the fields in both categories listed above are exempt from disclosure under Exemption 6, and, with respect to those records that refer to "cases where the government is in the role of prosecutor or plaintiff," the fields also are exempt from disclosure under Exemption 7(C). Def. Combined Mem. (Long I, 7/31/02) at 39, 40.

Plaintiffs "do not contest the Department's decision to withhold private information about individuals who have not been publicly charged with any offense." Pl. Combined Mem. (Long I) at 27 (emphasis in original). Thus, they do not challenge the Department's decision to withhold – on privacy grounds – specific fields in the criminal and civil immediate declination files, which, as noted above, contain records of criminal and civil referrals that USAOs promptly declined to pursue.[23] Instead, plaintiffs take issue with the Department's

---

[22]    The "court number" fields contain the case or docket number assigned by the court, and the "file name" fields contain the caption of the case. See Def. Mot. (Long I), Exhibits O (Central System Vaughn Index), Q (Central Collections System Vaughn Index), R (TIGAS Vaughn Index).

[23]    Plaintiffs likewise do not challenge the withholding of fields that identify the subject of records reflecting ongoing criminal and civil investigations or fugitive matters. As

position that the FOIA privacy exemptions apply "to information on individuals who have been publicly charged or named in a civil action." Id. Plaintiffs therefore object to the withholding of three categories of information in the central case management databases relating to criminal and civil matters: (1) the case or docket number assigned by the court; (2) the caption of the case; and (3) the name of the defendant in criminal proceedings and the name of the litigant opposing the government in civil litigation – all of which they assert are "readily available to the public" in circumstances where an individual has been publicly charged or named in a civil action. Id.[24]

Plaintiffs also note that the subject of a substantial number of case management records is not an individual, but rather "a business, a governmental unit, an organization, or an item of property named in a forfeiture or in rem proceeding." Pl. Combined Mem. (Long I) at 10-11. They contend that the personal privacy exemptions do not apply to such records and that the EOUSA easily could segregate and release a large portion of those that do not pertain to individuals because the central case management databases currently contain codes that allow the EOUSA to identify records that refer to non-individual entities or property. See id. at 11.[25]

_____

discussed below, such fields properly have been withheld under Exemption 7(A) as well as under Exemptions 6 and 7(C) – where the subject of the record is an individual.

[24]    In this regard, plaintiffs only are seeking release of the following fields: (1) "court number" in the criminal and civil files; (2) "file name" in the criminal and civil files; and (3) "defendant name" in the criminal files and the corresponding "litigant name" in the civil files. See Pl. Combined Mem. (Long I) at 10.

[25]    Plaintiffs therefore also are seeking release of the following fields from the following years, for those records that contain codes that identify the subject of the record as a non-individual entity or property: "defendant name," "court number," and "file name" from the criminal master flagged, criminal master unflagged, and criminal delete history files containing mid-year data for fiscal years 1999 and 2000 (Business or Property Code); "litigant name," "court number," and "file name" from the civil master flagged, civil master unflagged, and civil delete history files containing mid-year data for fiscal years 1999 and 2000 (Business or Property

1. Individuals

With respect to database records that pertain to individuals, the central dispute

between the parties involves competing interpretations of the Supreme Court's decision in United

States Department of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749

(1989) ("Reporters Committee"). As the Department points out, the requester in Reporters

Committee sought access to FBI "rap sheets," which contained descriptive information about

individuals, such as date of birth and physical characteristics, as well as "a history of arrests,

charges, convictions, and incarcerations." Reporters Committee, 489 U.S. at 752. The Court

held "as a categorical matter that a third party's request for law enforcement records or

information about a private citizen can reasonably be expected to invade that citizen's privacy."

Id. at 780. Furthermore, according to the Department, the Court in Reporters Committee rejected

the argument – much like the one advanced by plaintiffs here – that individuals have no privacy

interest in rap-sheet information – even when such information previously had been disclosed to

the public. See Def. Combined Mem. (Long I, 9/9/02) at 22-23.

In particular, the Department relies on the Court's statement that "there is a vast

difference between public records that might be found after a diligent search of courthouse files,

county archives, and local police stations throughout the country and a computerized summary

---

Code); "suspect" and "name" from the criminal immediate declination files containing mid-year
data for fiscal years 1999 and 2000 (Business or Property Code) and from the civil immediate
declination files containing fiscal year 1999 data (Business or Property Code); "court number,"
"name_first," "name_last,"and "address_1" from the TIGAS files containing mid-year data for
fiscal years 1999 and 2000 (Corporation or Property Forfeiture Code); and "debtor last name,"
"debtor first name," "court number," and "street address" from the Central Collections System
files containing data for fiscal years 1985 through 1997 (Property Forfeiture Code). See Pl.
Combined Mem. (Long I) at 11.

located in a single clearinghouse of information." <u>Reporters Committee</u>, 489 U.S. at 764; <u>see</u>
<u>also id</u>. at 766 (observing that "a strong privacy interest adheres in the nondisclosure of compiled
computerized information"). According to the Department, "[f]or each individual whose name
plaintiffs seek, the database contains a record of every criminal, civil, and collections case that
has been brought with respect to that individual in any of the 94 districts in the United States for
the past 25 years." Def. Combined Mem. (<u>Long I</u>, 9/9/02) at 22. Simply stated, the Department
contends that the central case management databases are the equivalent of a "rap sheet writ
large." <u>Id</u>.; Def. Combined Mem. (<u>Long I</u>, 7/31/02) at 43-44 n.10.

      Plaintiffs, of course, emphasize that much of the withheld information is readily
available to the public. They note, for example, that as part of the Public Access to Court
Electronic Records ("PACER") service, the Administrative Office of the United States Courts
discloses over the internet the names of litigants, the court number, and the nature of the criminal
offense or civil actions for each case that is maintained on PACER. <u>See</u> Pl. Combined Mem.
(<u>Long I</u>) at 27-28. They also point out that the EOUSA has provided the National Archives and
Records Administration ("NARA") with copies of the criminal and civil databases for the fiscal
years 1974 through 1989 without redacting litigant names, or other court docket information, and
that the NARA in turn has made the information available to the public. <u>See id</u>. at 28. Plaintiffs
thus distinguish <u>Reporters Committee</u> by arguing that unlike the rap-sheet information at issue
there, which was physically scattered across the country, the "practical obscurity" of the
information at issue here has been eliminated by disclosure through the NARA and PACER in
readily available electronic compilations. <u>See id</u>. at 31; Pl. Reply (<u>Long I</u>, 8/1/02) at 14, 16.

-40-

Plaintiffs further contend that the Court in <u>Reporters Committee</u> concluded that disclosure of information contained in a rap sheet raises privacy concerns not only because it is hard to obtain elsewhere but also because there exists a "web of federal statutory and regulatory provisions that limits the disclosure of rap-sheet information." <u>Reporters Committee</u>, 489 U.S. at 765. As they accurately point out, no comparable restrictions exist for court docket information. <u>See</u> Pl. Combined Mem. (<u>Long I</u>) at 31.

Finally, plaintiffs argue that in <u>Reporters Committee</u> the Court emphasized that "the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records," and that the "response to this request would not shed any light on the conduct of any Government agency or official." Pl. Combined Mem. (<u>Long I</u>) at 32 (quoting <u>Reporters Committee</u>, 489 U.S. at 773). In contrast, plaintiffs submit that disclosure of the identities of the individuals that are the subjects of central case management records would serve the public interest by allowing researchers "to evaluate the relationship between the litigant's identity and the government's action" and "to compare the EOUSA's information with the data compiled by the courts to identify differences and expand the possible topics of inquiry about the civil and criminal process." Pl. Combined Mem. (<u>Long I</u>) at 30; <u>see also</u> Second Burnham Decl. (<u>Long I</u>) ¶¶ 6-8; Maltz Decl. (<u>Long I</u>) ¶ 13; Pl. Mot. (<u>Long I</u>, 8/5/02) Seventh Declaration of Susan Long ("Seventh Long Decl.") ¶ 40. More broadly, they contend that "[t]he public interest in examining data that chronicle the Department's activities to determine if the data are reliable, whether conclusions that the Department draws from the data are accurate, and whether the data support policies different from those advocated by the Department, falls squarely within FOIA's core purpose of requiring disclosure of '[o]fficial information that sheds

-41-

light on an agency's performance of its statutory duties.'" Pl. Reply (<u>Long I</u>, 8/1/02) at 18

(quoting <u>Reporters Committee</u>, 489 U.S. at 773).

The Department replies, in part, that information obtainable through PACER is

not "freely available" in that accessing records on PACER requires time, specialized knowledge,

and costs money. Def. Combined Mem. (<u>Long I</u>, 9/9/02) at 24-25. The Department also points

out that dozens of federal courts do not participate in PACER. The thrust of the Department's

reply, however, is that even if PACER information were freely available, "PACER is no

substitute for the EOUSA database" because – as even plaintiffs concede, <u>see</u> Pl. Combined

Mem. (<u>Long I</u>) at 30 – central case management files contain information that is not available on

PACER, such as the identity of the law enforcement agency that initiated certain investigations

and referred matters for prosecution. <u>Id</u>. at 25-26; <u>see also</u> <u>Halloran v. Veterans Admin.</u>, 874

F.2d 315, 321 (5th Cir. 1989) ("In both FOIA and other contexts involving privacy concerns, it

has long been the rule that our concern is not with the identifying information <u>per se</u>, but with the

connection between such information and some other detail – a statement, an event, or otherwise

– which the individual would not wish to be publicly disclosed.").

With respect to information withheld under Exemption 7(C), the Department

contends that plaintiffs' position is foreclosed by the D.C. Circuit's decision in <u>SafeCard Servs.,</u>

<u>Inc. v. SEC</u>, 926 F.2d 1197 (D.C. Cir. 1991). <u>See</u> Def. Combined Mem. (<u>Long I</u>, 9/9/02) at

28-29. In that case, the court stated that:

> unless there is compelling evidence that the agency denying the FOIA
> request is engaged in illegal activity, and access to the names of
> private individuals appearing in the agency's law enforcement files
> is necessary in order to confirm or refute that evidence, there is no

> reason to believe that the incremental public interest in such
> information would ever be significant.

SafeCard Servs., Inc. v. SEC, 926 F.2d at 1205-06. The court went on to "hold categorically

that, unless access to the names and addresses of private individuals appearing in files within the

ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the

agency is engaged in illegal activity, such information is exempt from disclosure." Id. at 1206.

Because plaintiffs have not alleged that the EOUSA is engaged in illegal activity, the Department

argues that the identities of those case management records that pertain to law enforcement

proceedings are exempt from disclosure. Def. Combined Mem. (Long I, 9/9/02) at 29.

   With respect to information withheld solely under Exemption 6 – namely, those

records that pertain to cases in which the government is not in the role of plaintiff or prosecutor –

the Department asserts that (1) plaintiffs have failed to identify a legitimate public interest that

would override the privacy interests protected by the exemption; and (2) in any event, plaintiffs

have failed to demonstrate how the interests they have asserted would be served by disclosure.

See Def. Combined Mem. (Long I, 9/9/02) at 29-35.

   As an initial matter, the Court finds that with regard to case management records

compiled for law enforcement purposes, disclosure of fields identifying the subject of the records

would implicate privacy interests protected by Exemption 7(C). See Reporters Committee, 489

U.S. at 780 (holding "as a categorical matter that a third party's request for law enforcement

records or information about a private citizen can reasonably be expected to invade that citizen's

privacy"). The categorical principle announced in Reports Committee is particularly applicable

here, where the information at issue is maintained by the government in computerized

compilations. See id. (in such instances, "the privacy interest protected by Exemption 7(C) is in fact at its apex"). Furthermore, as Reporters Committee makes clear, the fact that some of the personal information contained in these records already has been made public in some form does not eliminate the privacy interest in avoiding further disclosure by the government. Id. at 762-63 (expressly rejecting argument that prior disclosure eviscerates privacy interest); see also Nat'l Archives & Records Admin. v. Favish, 541 U.S. at 171; Dep't of the Air Force v. Rose, 425 U.S. at 380-81; Kimberlin v. Dep't of Justice, 139 F.3d at 949; Harrison v. Exec. Office for U.S. Attorneys, 377 F. Supp. 2d 141, 148 (D.D.C. 2005). And perhaps most importantly, it is undisputed that some of the information contained in the case management records is not publicly available. Simply stated, the records available at NARA and on PACER are no substitute for the central case management databases at issue in this litigation.

To be sure, the extent to which the withheld information is publicly available is relevant in determining the magnitude of the privacy interest at stake. In this regard, the Court finds that information available at the NARA or disseminated over the internet through PACER is decidedly less obscure than "public records that might be found after a diligent search of courthouse files, county archives, and local police stations throughout the country." Reporters Committee, 489 U.S. at 764. Accordingly, while the Court has determined that disclosure of fields identifying the subject of central case management records compiled for law enforcement purposes would implicate protected privacy interests, it further finds that the interests at stake are significantly less substantial than those at issue in Reporters Committee.

Having determined that "the privacy concerns addressed by Exemption 7(C) are present," the Court now must balance "the competing interests in privacy and disclosure." Nat'l

-44-

Archives & Records Admin. v. Favish, 541 U.S. at 172. To do so, the Court must determine whether plaintiffs have shown that (1) "the public interest sought to be advanced is a significant one" that outweighs the privacy interests at stake, and (2) disclosure of the requested information "is likely to advance that [public] interest." Id.

In making this determination, the Court first notes that the categorical rule announced in SafeCard Services – namely, that the privacy-protected information contained in law enforcement files is exempt from disclosure unless the requester can show (1) compelling evidence that the agency is engaged in illegal activity, and (2) that the information is necessary to confirm or refute that evidence – does not apply where plaintiffs are seeking information solely about individuals who have been publicly charged in a criminal case or publicly named in a civil action. See Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 896 (D.C. Cir. 1995) (blanket exemption under SafeCard for all names in law enforcement records absent showing that the information would confirm or refute allegations of illegal agency activity "would be contrary to FOIA's overall purpose of disclosure, and thus is not a permissible reading of Exemption 7(C)."). Rather, the public interest in disclosure must be measured more generally in terms of the relationship between the information sought and "the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'" Reporters Committee, 489 U.S. at 772 (quoting Dep't of the Air Force v. Rose, 425 U.S. at 372). Plaintiffs therefore must credibly demonstrate with sufficient specificity that the records sought will shed light on agency conduct.

Plaintiffs have failed to make such a showing. First, their argument that disclosure of individuals' names will allow "researchers to evaluate the relationship between the

litigant's identity and the government's action," Pl. Combined Mem. (Long I) at 30, is overbroad on its face. Such a sweeping justification would require disclosure of the identities of individuals in virtually all government files that pertain to a government action. See Hopkins v. U.S. Dep't of Housing and Urban Dev., 929 F.2d 81, 88 (2d Cir.1991) ("Were we to compel disclosure of personal information with so attenuated a relationship to governmental activity . . . we would open the door to disclosure of virtually all personal information, thereby eviscerating the FOIA privacy exemptions."); Miller v. Bell, 661 F.2d 623, 630 (7th Cir. 1981) (noting that where a requester's proffered public interest was only "to serve as a watchdog over the adequacy and completeness of an FBI investigation, . . . this justification would apparently apply to every FBI criminal investigation, severely vitiating the privacy and confidentiality provisions of exemptions 7(C) and (D)").

Second, as the Department points out, see Def. Combined Mem. (Long I, 9/9/02) at 32, the only support that plaintiffs have put forward for this argument is the declaration of David Burnham. Mr. Burnham, however, asserts no public interest in evaluating the relationship between the identity of individual litigants and government action; rather, he makes this assertion only with respect to "the names of businesses, governmental units, and . . . property." Second Burnham Decl. (Long I)") ¶ 6. As a result, even if one assumes that evaluating the relationship between individual litigants and government action is a significant public interest that outweighs the privacy interests at stake, plaintiffs still have failed to demonstrate how disclosure would advance this asserted public interest. See Halloran v. Veterans Admin., 874 F.2d at 322 (requester must show "how [the asserted] interest would be served by compelling disclosure").

-46-

Plaintiffs have not shown that the identity of particular individuals is relevant in any way to an inquiry into the Department's conduct.

Finally, plaintiffs' argument that there exists a public interest in "compar[ing] the EOUSA's information with the data compiled by the courts to identify differences and expand the possible topics of inquiry about the civil and criminal litigation process," Pl. Combined Mem. (Long I) at 30, also misses the mark. For starters, plaintiffs have failed to demonstrate how these asserted interests would reveal anything significant about "what the Government is up to." Reporters Committee, 489 U.S. at 780. While the Court recognizes that data analysis and the expansion of areas of scholarly inquiry certainly are legitimate objectives, when, as here, such endeavors are not focused on examining agency conduct, they simply cannot outweigh the privacy concerns addressed by the FOIA's privacy exemptions. See Nat'l Ass'n of Retired Fed. Employees v. Horner, 879 F.2d at 879 ("unless the public would learn something directly about the workings of the Government," there is no public interest in disclosure) (emphasis in original). And once again, even assuming that both identifying discrepancies in government data or expanding upon topics of scholarly inquiry were sufficiently significant public interests, plaintiffs have failed to explain with sufficient specificity how these asserted interests would be served by disclosure of the information sought. See Halloran v. Veterans Admin., 874 F.2d at 322.

In short, as the D.C. Circuit has recognized, "'disclosure of information about private citizens that is accumulated in various governmental files' would 'reveal[] little or nothing about an agency's own conduct.'" Reed v. Nat'l Labor Relations Bd., 927 F.2d 1249, 1251 (D.C. Cir. 1991) (quoting Reporters Committee, 489 U.S. at 773). Although plaintiffs have

shown "an interest more specific than having the information for its own sake," Nat'l Archives & Records Admin. v. Favish, 541 U.S. at 172, they have failed to demonstrate that the information sought is sufficiently probative of agency conduct to outweigh the privacy interests at issue. Accordingly, the Court concludes – subject to the conclusions stated below in Part II.D.2 of this Opinion – that the Department properly has withheld under Exemption 7(C) the "court number," "file name," "defendant name," and "litigant name" fields in the criminal and civil files that refer to cases where the government is in the role of prosecutor or plaintiff, and the subject of the record is an individual.

On the other hand, with respect to records in which the government is not in the role of prosecutor or plaintiff – i.e., records that have not been compiled for law enforcement purposes – the Court agrees with plaintiffs that disclosure of fields that identify the subjects of the records would not implicate any privacy interests protected by Exemption 6. All of these records involve instances where individuals voluntarily have chosen to sue the government, thereby effectively waiving any privacy interests relating to the fact that they are in litigation with the government. See Nation Magazine v. U.S. Customs Serv., 71 F.3d at 896 n.10 (individual's "voluntary decision to publicly disclose" certain information "distinguishes this case from other situations where the government, rather than the individual, puts information in the public domain") (citing Reporters Committee, 489 U.S. at 762-71; Davis v. U.S. Dep't of Justice, 969 F.2d at 1279-80). And unlike the records that have been compiled for law enforcement purposes, the Department has not shown that these records contain additional, non-public information protected by Exemption 6.

-48-

Because no significant privacy interests would be implicated by disclosure of
information relating to the identities of the individuals who are the subjects of these records, the
"FOIA demands disclosure." Nat'l Ass'n of Retired Fed. Employees v. Horner, 879 F.2d at 874.
Accordingly, the Court concludes that the Department must release the information contained in
the "court number," "file name," and "litigant name" fields in the civil flagged master, civil
unflagged master, and civil delete history files that pertain to cases where the government is the
defendant.

### 2. Non-Individual Entities or Property

As noted above, a relatively small percentage – though a substantial number – of
the central case management records pertain to non-individual entities or property and not to
individuals. Although the Department acknowledges that as a general matter, "information
pertaining to corporations and like entities is not exempt from disclosure," Def. Combined Mem.
(Long I, 7/31/02) at 56 (citing Nat'l Parks and Conservation Ass'n v. Kleppe, 547 F.2d 673, 685
n.44 (D.C. Cir. 1976)), it nevertheless maintains that the EOUSA cannot reasonably segregate
such non-exempt information contained in the "name," "court number," and "file name" fields
because (1) the EOUSA has no reasonable means of identifying records in which revealing the
identity of the non-individual entity may nonetheless violate personal privacy; and (2) even
where the subject of the record can be identified as a non-individual, the fields in question may
reveal the identities of individuals associated with the proceedings, and segregating out the fields
that contain these individuals' names would require the EOUSA to conduct a prohibitively

burdensome manual review of nearly every record in the databases. See Def. Combined Mem.
(Long I, 7/31/02) at 55-58; Def. Combined Mem. (Long I, 9/9/02) at 35-43.

In support of its claim that the identities of the non-individual entities may in
some instances violate personal privacy, the Department argues that in the case of closely-held
corporations or sole proprietorships, for example, the name of the entity often is tied to that of an
individual. See Def. Combined Mem. (Long I, 7/31/02) at 55-56 (citing Campaign for Family
Farms v. Glickman, 200 F.3d 1180, 1188-89 (8th Cir. 2000); 1 BURT A. BRAVERMAN &
FRANCES J. CHETWYND, INFORMATION LAW § 10-4.1.3, at 412 (1985)). The Department then
notes that it identified one instance where an "individual's name appeared as part of the name of
an incorporated entity ('[Name] Farms')', located in a small town, for which the individual was
the registered agent." Id. at 40 n.8. In support of its claim that even where records are
designated as pertaining to non-individual entities or property the fields in question may
incidentally reveal the identities of individuals associated with the proceedings, the Department
asserts that the "name" fields in these records "occasionally" contain the names of individuals
and the "court number" and "file name" fields "routinely" do. See Def. Combined Mem. (Long
I, 7/31/02) at 56-57; Def. Combined Mem. (Long I, 9/9/02) at 39-40; Hamilton Decl. ¶¶ 14, 15;
Davis Decl. ¶ 106.

The Court agrees with the Department that an individual's privacy interests may
be implicated by disclosure of information contained in nominally "corporate" records if the
information is personally sensitive and can be directly attributed to that individual. See
Campaign for Family Farms v. Glickman, 200 F.3d at 1188-89. The Department, however, has
failed to demonstrate that any of the records from which it has withheld the "name," "court

number," and "file name" fields actually contain corporate information that is both personal in nature and sufficiently sensitive. At most, they have shown that disclosure of one record would reveal that an individual is associated with a business that in turn is a party to legal proceedings. That fact, standing alone, does not implicate the FOIA's personal privacy concerns addressed by Exemptions 6 and 7(C). See Washington Post Co. v. U.S. Dep't of Agriculture, 943 F. Supp. 31, 35-36 (D.D.C. 1996).

On the other hand, disclosure of those records with fields that "occasionally" or "routinely" contain the names of individuals would implicate protected privacy interests. Because some of the records designated as pertaining to non-individual entities and property may contain privacy-protected information – while the vast majority do not – the Court must address the Department's contention that the information contained in the relevant fields is not "reasonably segregable" because the task of segregating the non-exempt information for release would place an overwhelming burden on the Department. See 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided . . . after deletion of the portions which are exempt."). The Court is not convinced by the Department's arguments.

Initially, the Department asserted that segregating the information would require a manual review of approximately one million records, which it estimates is the total number of records in the databases – covering the 25-year period of their existence – pertaining to a non-individual entity or property. In its reply brief, however, the Department argues that because the vast majority of records in the databases do not contain codes that identify the records as pertaining to individuals, non-individual entities, or property, the number of records that actually

would require manual review is close to the total number of records in the databases, which comprise approximately 15 million records. Def. Combined Mem. (Long I, 9/9/02) at 42-43.

The Court finds that the Department's figures are substantially inflated. The Department inexplicably ignores the fact that plaintiffs only are seeking release of the relevant fields from those records – mainly from fiscal year 1998 and beyond – that are coded and therefore are readily identifiable as pertaining to non-individual entities or property. Although it is unclear precisely how many records the Department may be required to review manually, the Department concedes that "Plaintiffs are correct that the total number of records bearing identifying codes is significantly less" than 1 million. Def. Combined Mem. (Long I, 9/9/02) at 42-43; see also Pl. Combined Mem. (Long I) at 41 (arguing that Department's initial estimate of 1 million was inflated "by at least ten-fold"). In any event, because the Department has not addressed the burden involved in reviewing the actual records at issue, the Court also finds that it has not shown that the task would be an overwhelming one. As a result, the Department must release all non-exempt information contained in the fields listed supra at note 25.

### E. Exemption 7(A)

Exemption 7(A) of the FOIA protects from disclosure records or information compiled for law enforcement purposes to the extent that disclosure "could reasonably be expected to interfere with law enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). To satisfy its burden justifying the applicability of Exemption 7(A), the agency must demonstrate that (1) a law enforcement proceeding is pending or prospective; and (2) disclosure of the information could reasonably be expected to cause some articulable harm to the proceeding. Voinche v. FBI, 46 F.

Supp. 2d 26, 31 (D.D.C. 1999); see also North v. Walsh, 881 F.2d 1088, 1097 (D.C. Cir. 1989)

(agency must show that disclosure "would, in some particular, discernible way, disrupt, impede,

or otherwise harm the enforcement proceeding"); Campbell v. Dep't of Health and Human

Servs., 682 F.2d 256, 259 (D.C. Cir. 1982) ("We hold that, to prevail under Exemption 7(A), the

government must show, by more than conclusory statement, how the particular kinds of

investigatory records requested would interfere with a pending enforcement proceeding.").

        The FOIA permits agencies to craft rules exempting certain categories of records

from disclosure under Exemption 7(A) instead of making a record-by-record showing. NLRB v.

Robbins Tire & Rubber Co., 437 U.S. 214, 236 (1978); Bevis v. Dep't of State, 801 F.2d 1386,

1389 (D.C. Cir. 1986); Crooker v. Bureau of Alcohol, Tobacco & Firearms, 789 F.2d 64, 67

(D.C. Cir. 1986). An agency's ability to rely on categorical rules, however, has limits.

Specifically, the agency must divide information it seeks to withhold into "categories . . . [that

are] sufficiently distinct to allow a court to grasp 'how each . . . category of documents, if

disclosed, would interfere with the investigation.'" Crooker v. Bureau of Alcohol, Tobacco &

Firearms, 789 F.2d at 67 (quoting Campbell v. Dep't of Health and Human Servs., 682 F.2d at

265)). An acceptable category is one that is "functional" – that is, that "allows the court to trace

a rational link between the nature of the document and the alleged likely interference." Id.; see

also Nation Magazine v. U.S. Customs Serv., 71 F.3d at 893 ("There are limits . . . to when

categorical rules may be employed. Only when the range of circumstances included in the

category 'characteristically support[s] an inference' that the statutory requirements for exemption

are satisfied is such a rule appropriate.") (citing United States v. Landano, 508 U.S. 165, 176-80

(1993)).

-53-

1. Criminal Lead Charge

Invoking Exemption 7(A), the Department has withheld the "criminal lead charge" field in the criminal flagged master and criminal unflagged master files from fiscal year 1999 onward for those records that pertain to "criminal cases identified as being in the investigative stage (i.e., cases in which no indictment, information, or complaint is detected)." Def. Combined Mem. (Long I, 7/31/02) at 46.[26] The "criminal lead charge" field identifies the principal charge of an investigation or prosecution by the title and section number – and sometimes the subsection – of the United States Code.  The Department asserts that release of the "criminal lead charge" entries "in combination with other fields of information contained in the case management records, could jeopardize law enforcement proceedings by alerting suspects as to the existence and/or nature of investigations into their criminal activities." Def. Combined Mem. (Long I, 9/9/02) at 3.  In support of its position, the Department relies primarily on two declarations by Kenneth L. Wainstein, the current United States Attorney for the District of Columbia.[27]  According to Mr. Wainstein, "if the target of an ongoing investigation becomes

---

[26]   By letter dated March 4, 2003, the EOUSA notified TRAC that with respect to central case management data compiled from December 2002 onward, the EOUSA would begin to withhold the "criminal lead charge" field from records of ongoing investigations in the criminal delete history file, as well as in the criminal flagged master and criminal unflagged master files.  See O'Rourke Decl., Exhibit 3.  The stated purpose for the decision was to make the EOUSA's practice of withholding the "criminal lead charge" field from records of ongoing investigations consistent with its determination in October 2002 to redact information contained in the "program category" field from records of ongoing investigations in the criminal flagged master, criminal unflagged master, and criminal delete history files.  See id.

[27]   Mr. Wainstein was the Director of the EOUSA at the time that he signed and swore to the first declaration he submitted in support of the Department's motion for summary judgment in Long I.  See Def. Mot. (Long I), Declaration of Kenneth L. Wainstein ("Wainstein Decl.") ¶ 1.  He was serving as the General Counsel of the Federal Bureau of Investigation when

aware of the nature of that investigation – or even just the fact that such an investigation is in progress – that target can reasonably be expected to alter his or her behavior to evade or obstruct law enforcement efforts." Wainstein Decl. ¶ 3.

Of "particular concern" to the Department is the combination of the "criminal lead charge" field and those fields that identify the location of the investigation. Wainstein Decl. ¶ 4. The Department argues that this concern becomes even greater with respect to records that pertain to relatively infrequent or highly specific offenses. See Def. Combined Mem. (Long I, 9/9/02) at 13-18; Wainstein Decl. ¶ 5; Second Wainstein Decl. ¶¶ 4-5. For example, Mr. Wainstein submits that "[a] suspected embezzler could identify an investigation pertaining to him/herself using the fields 'criminal lead charge,' 'branch,' and 'estimated dollar loss,' which together would convey the existence of an investigation into embezzlement of a specific amount in a specific geographic area." Wainstein Decl. ¶ 5.

The Department concedes, however, that in most instances, "redaction of the suspects' names and other directly identifying information would likely be sufficient to prevent against the harm in question, in which cases the information contained in the 'criminal lead charge' fields would not be exempt." Def. Combined Mem. (Long I, 7/31/02) at 58-59; see also Wainstein Decl. ¶¶ 4, 7.[28] Despite this concession, the Department nevertheless has withheld the "criminal lead charge" entries from every record pertaining to an ongoing investigation on the

---

he submitted the second declaration. See Def. Mot. (Long I), Second Declaration of Kenneth L. Wainstein ("Second Wainstein Decl.") ¶ 1.

[28]     As noted, plaintiffs do not challenge the Department's decision to withhold names and other identifying information in those records pertaining to ongoing criminal investigations. See note 23, supra.

ground that the "individualized assessment of each case" that would be required to identify non-exempt information "would constitute an enormously burdensome and time-consuming undertaking . . . fraught with the potential for erroneous determinations" due to "the inherent subjectivity of the assessment." Def. Combined Mem. (Long I, 7/31/02) at 59; see also Wainstein Decl. ¶ 7; Garvey Decl. (Long I) ¶ 23.

Plaintiffs respond first by noting that the Department "actively" has disseminated "criminal lead charge" information contained in records of ongoing investigations for at least 20 years prior to this litigation. Pl. Combined Mem. (Long I) at 16; see also Seventh Long Decl. ¶¶ 10-13. For example, the EOUSA did not withhold the information from the central case management data for fiscal years 1974 through 1998 that it previously released to TRAC under the FOIA or from the data for fiscal years 1974 through 1989 that it previously disclosed to the public through the NARA. Despite this long history of "criminal lead charge" information being made publicly available, plaintiffs point out that the Department has failed to provide a single example of an investigation that has been compromised because of such disclosures.

Plaintiffs' principal argument, however, is that the Department's exemption claim with respect to "criminal lead charge" information must be rejected because it is premised on unreasonable speculation and hypothetical combinations of database entries rather than particularized proof. See Pl. Combined Mem. (Long I) at 18-20 (citing City of Chicago v. Dep't of the Treasury, 287 F.3d 628 (7th Cir. 2002); Arieff v. U.S. Dep't of the Navy, 712 F.2d 1462 (D.C. Cir. 1983)). Relying on the declaration of Professor Michael D. Maltz, plaintiffs further assert that the Department's "theory for withholding the lead charge is not only speculative, but

wrong." Pl. Combined Mem. (Long I) at 20.[29] Specifically, they contend that the Department's

asserted justifications for withholding "criminal lead charge" information are contradicted by

application of statistical principles in three significant respects.

First, plaintiffs argue that the population of potential suspects is not sufficiently

limited – that is, it is too large – to permit indirect identification from a combination of the

"criminal lead charge" and other information. See Pl. Combined Mem. (Long I) at 21-23; Maltz

Decl. (Long I) ¶¶ 17, 18 (noting, for example, that while Census Bureau privacy standards

generally allow the release of data that does not contain geographic codes identifying areas of

less than 100,000 persons, the USAO for the smallest federal district covers an area with a

population of approximately 479,000 persons). Second, they assert that the "criminal lead

charge" entries are too general to reasonably expect that suspects will be able to identify

themselves as targets of criminal investigations. See Pl. Combined Mem. (Long I) at 23-24;

Maltz Decl. (Long I) ¶¶ 19-23. Finally, plaintiffs argue that information contained in other fields

does not justify withholding "criminal lead charge" information. See Pl. Combined Mem. (Long

I) at 25-26. In this regard, they note that the other fields identified in the Department's

hypothetical examples, rather than containing identifying information, are actually "empty in

more than 97% of the records" at issue. Pl. Reply (Long I, 10/2/02) at 12; Seventh Long Decl.

---

[29]     Dr. Maltz is an emeritus professor in the Department of Criminal Justice and the
Department of Information and Decision Sciences at the University of Illinois at Chicago. Maltz
Decl. (Long I) ¶ 1. According to his declaration, he has conducted "extensive work in
quantitative analysis of law enforcement data" over the past 35 years. Id. Plaintiffs describe him
as a "statistical expert." Pl. Combined Mem. (Long I) at 18. The Department, meanwhile,
vigorously challenges Dr. Maltz's methodologies and conclusions, see Def. Combined Mem.
(Long I, 9/9/02) at 9-21, as well as the scope of his expertise, see, e.g., id. at 20-21 (arguing that
Dr. Maltz is not qualified to render an opinion on the probable mental state of criminal suspects).

¶¶ 17, 18. At best, plaintiffs submit, the Department has offered a tenuous justification for withholding the information contained in certain of these other fields in a very small percentage of records, but absolutely no justification for withholding the "criminal lead charge" entries from every record that pertains to an ongoing investigation.

The Court agrees with plaintiffs. While the Wainstein declarations assert that hypothetical combinations of database fields could provide suspects with the ability to identify records as pertaining to them, the Department offers no evidence that there in fact exists any record that has such a combination. To the contrary, the record in this case demonstrates that a substantial if not overwhelming majority of the records do not contain such a combination. To permit the Department to withhold categorically all of the "criminal lead charge" entries from the records at issue in the face of such evidence would eviscerate the principles of openness in government that the FOIA embodies. See Center for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d 918, 937 (D.C. Cir. 2003) (Tatel, J., dissenting).

In short, the Department bears the burden of reviewing plaintiffs' requests, identifying either specific documents or functional categories of information that are exempt from disclosure, and disclosing any reasonably segregable, non-exempt portion of the requested materials. 5 U.S.C. § 522(b). The Department fails to satisfy that burden here, for the range of circumstances included in the Department's Exemption 7(A) claims with respect to the "criminal lead charge" entries do not "characteristically support" an inference that disclosure of this information would interfere with law enforcement proceedings. Nation Magazine v. U.S. Customs Serv., 71 F.3d at 893 (citing United States v. Landano, 508 U.S. 165, 176-80 (1993)).

Accordingly, for the reasons stated, the Court concludes that the Department has not satisfied its burden to justify the withholding of the "criminal lead charge" entries from every database record that pertains to an ongoing investigation.

### 2. Program Category

The Department similarly invokes Exemption 7(A) to justify its decision to withhold the "program category" field from those records that pertain to ongoing criminal investigations in the criminal flagged master, criminal unflagged master, and criminal delete history files for May 2002 and subsequent months. The "program category" field contains approximately 90 individual codes that identify the type of criminal activity that is the subject of the investigation or prosecution. The codes are subdivided into more generalized categories of federal criminal offenses, such as public corruption, organized crime, white collar crime/fraud, antitrust violations, narcotics and dangerous drugs, and international terrorism, among several others. See O'Rourke Decl., Exhibit 4. In addition, many of the 90 individual "program category" codes are accompanied by descriptions that provide varying degrees of detail about the offense being investigated or prosecuted. For example, code 45, which appears under the "Narcotics and Dangerous Drugs" category, is entitled "Simple Drug Possession" and is described as "[v]iolations involving personal possession or use under 21 U.S.C. § 844." Id.

Relying principally on the declarations of Alan Gershel, Chair of the Criminal Chief's Working Group ("CCWG"), and Jeffrey D. Rupert, Attorney Advisor in the EOUSA Office of the Director, the Department contends -- with nearly identical arguments to those it unsuccessfully has advanced in connection with its decision to withhold "criminal lead charge"

information – that the release of "program category" codes, in combination with other information from the EOUSA's central case management databases, could jeopardize law enforcement proceedings by alerting suspects either (1) to the fact that they are under investigation; (2) that there is a reasonable chance that they are under investigation; or (3) to additional information which could help them obstruct an investigation into their criminal activities. See Def. Mot. (Long II), Declaration of Alan Gershel ("Gershel Decl.") ¶ 5; Def. Mot. (Long II), Declaration of Jeffrey D. Rupert ("Rupert Decl. (Long II") ¶¶ 9-12; O'Rourke Decl. ¶¶ 42-43.[30]

Once again, of particular concern to the Department is the combination of the "program category" field and the fields that identify the location of the investigation. See O'Rourke Decl. ¶ 44. The Department similarly maintains that the risk of a compromised investigation is elevated in circumstances when the type of criminal activity involved is relatively uncommon, see Def. Combined Mem. (Long II) at 17 (listing examples), and the criminal offense

---

[30]     According to the Department, the CCWG consists of approximately 13 Criminal Chiefs from various USAOs, and its primary purpose is to represent the interests of all Criminal Chiefs and criminal AUSAs throughout the Department. See Combined Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, filed in Long II, May 30, 2003 ("Def. Combined Mem. (Long II)") at 16 n.5; Gershel Decl. ¶ 3. In addition to serving as Chair of the CCWG, Mr. Gershel is also the Criminal Chief and First Assistant United States Attorney for the United States Attorney's Office in the Eastern District of Michigan, a position he has held since 1989. See Gershel Decl. ¶ 1.

Since January 2002, Mr. Rupert has been assigned to the DOJ Anti-Terrorism Task Force ("ATTF"). In that capacity, he has served on a counter-terrorism detail at FBI Headquarters, instructed courses on "Changes in the Law Since 9-11" at the National Advocacy Center and FBI Academy, coordinated the USAO Intelligence Research Specialist Program, and served as the EOUSA point-of-contact for the USAO ATTF Coordinators. His duties include serving as the primary advisor to the EOUSA's Director on matters related to counter-terrorism. Rupert Decl. (Long II") ¶ 2.

takes place in a relatively small district. See Gershel Decl. ¶ 7. Aside from fields designating

location, the Department further contends that the right combination of the "program category"

and other fields could "provide suspects with a roadmap of the government's investigative focus

and strategy and allow suspects to obstruct investigations." Def. Combined Mem. (Long II) at

20; see also id. at 19-20 (providing various hypothetical combinations).

      For the same reasons articulated above with respect to "criminal lead charge"

information, the Court concludes that the Department's arguments provide inadequate

justification for its categorical decision to withhold the "program category" entries from every

database record that pertains to an ongoing investigation.

      The Department, however, has identified a discrete and functional subset of

"program category" entries that properly may be withheld under Exemption 7(A): 13 codes

directly related to terrorism investigations and prosecutions. In Center for National Security

Studies v. United States Department of Justice, 331 F.3d 918 (D.C. Cir. 2003), a case involving

FOIA requests for information concerning persons detained in the wake of the September 11,

2001 terrorist attacks, a divided panel of the D.C. Circuit concluded that the principle of judicial

deference to the executive on matters of national security applies to cases where the executive

invokes Exemption 7(A) and "the government's declarations raise legitimate concerns that

disclosure would impair national security." Id. at 928; see generally id. at 926-29. Expressly

deferring "to the government's judgments contained in its affidavits," id. at 927, the court held

that the government's expectation that disclosure of the detainees' names would enable "terrorist

groups to map the course of the investigation and thus develop the means to impede it is reasonable." Id. at 928.[31]

Here, the Department emphasizes that its decision to begin withholding "program category" information was prompted by the "prospect of disclosing monthly information identifying the existence, location and focus of highly sensitive terrorism and anti-terrorism investigations." Def. Combined Mem. (Long II) at 9; see also O'Rourke Decl. ¶ 35.  The Department also recounts two successful anti-terrorism operations – one in Portland, Oregon; the other in North Carolina – and asserts that disclosure of "program category" information in combination with other fields reasonably could have alerted the targets to the existence of the investigations and provided them with the means to obstruct law enforcement. See Def. Combined Mem. (Long II) at 18-19; Gershel Decl. ¶¶ 7, 8.[32]  Simply stated, the Department asserts in its briefs and supporting declarations that disclosure of "program category" information related to terrorism investigations poses a significant risk to national security because, in some instances, it would reveal the focus and scope of terrorism investigations and enable suspects or other individuals to obstruct law enforcement.[33]

_____

[31]    In support of its decision to withhold the names of detainees, the government submitted affidavits from James Reynolds, Director of the Terrorism and Violent Crimes Section of the Department of Justice, and Dale Watson, FBI Executive Assistant Director for Counterterrorism. Center for Nat'l Sec. Studies v. U.S. Dep't of Justice, 331 F.3d at 923.

[32]    In support of the Department's position that disclosure of terrorism-related "program category" codes could have thwarted these prosecutions, Mr. Gershel notes that certain of the individuals under investigation were sophisticated or proficient computer professionals who presumably had the ability to access the information that TRAC makes available to the public. See Gershel Decl. ¶¶ 7, 8.

[33]    With respect to the individuals under investigation in the anti-terrorism operations in Oregon and North Carolina, Mr. Gershel states that disclosure of terrorism-related "project

According "appropriate deference" to the Department's judgments regarding matters of national security in this case in accordance with the D.C. Circuit's decision in <u>Center for National Security Studies</u>, 331 F.3d at 926, the Court concludes that the Department has provided adequate justification, under Exemption 7(A), for withholding the "program category" entries related to terrorism – specifically, codes 071 through 076 and 07A through 07G listed in Exhibit 4 of the O'Rourke Declaration – from records pertaining to ongoing investigations.

### F. Exemption 7(E)

Exemption 7(E) of the FOIA protects from disclosure records or information compiled for law enforcement purposes to the extent that disclosure "would disclose techniques and procedures for law enforcement investigations or prosecutions . . . if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); <u>see also</u> <u>Blanton v. U.S. Dep't of Justice</u>, 63 F. Supp. 2d 35, 49 (D.D.C. 1999).

---

category" codes in combination with other fields of information could have alerted the individuals to the existence of the investigations, at which time the individuals could have destroyed or fabricated evidence, intimidated or harmed witnesses, and/or fled the jurisdiction of the United States. <u>See</u> Gershel Decl. ¶¶ 7, 8. Mr. Rupert more generally states:

> If the "program category" codes are not redacted for ongoing investigations, the data would show where current terrorism-related investigations and anti-terrorism operations are occurring. Significantly, the data would also show where anti-terrorism operations and investigations are <u>not</u> occurring. If potential terrorists knew where the federal government was and was not conducting anti-terrorism operations and investigations at any given time, they could use that information to obstruct and evade justice.

Rupert Decl. (<u>Long II</u>") ¶ 10.

Expressly relying on the same arguments advanced in connection with the

Department's withholding of "program category" information for criminal matters in the

investigative stage under Exemption 7(A), the Department argues that the same information

contained in the "project category" entries for such matters also is exempt under Exemption 7(E).

See Def. Combined Mem. (Long II) at 24.  Specifically, the Department contends that

"'[p]rogram category' entries, in conjunction with location information, would provide a

roadmap of locations where federal authorities are, and are not, actively engaged in sensitive

criminal and terrorist investigations, as well as the specific focus of those investigations." Reply

in Support of Defendant's Motion for Summary Judgment, filed in Long II, July 11, 2003 ("Def.

Reply (Long II) at 21.  The Department essentially concedes, however, that releasing the entries

would not reveal "a traditional investigative technique." Id.  Instead, it simply characterizes the

effect of their release as the disclosure of "sensitive law enforcement information that otherwise

would not be known to the public." Id.

Because the Court has concluded that certain categories of "program category"

information are exempt from disclosure under Exemption 7(A) – namely, those that refer to

terrorism investigations – the Court will not consider whether that information also is exempt

under Exemption 7(E).[34]  With respect to all other "program category" information, the Court

concludes that the Department has not shown that the entries are exempt under Exemption 7(E).

Specifically, the Department has failed to identify any law enforcement technique or procedure

that would be disclosed upon release of the information.

---

[34]     As a result, the Court does not address the effect, if any, of the holding in Center
for National Studies on the Department's Exemption 7(E) claims with respect to the "project
category" information that properly is withheld under Exemption 7(A).

## G. Exemption 7(F)

Exemption 7(F) of the FOIA protects from disclosure records or information compiled for law enforcement purposes to the extent that disclosure "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F); see also Blanton v. U.S. Dep't of Justice, 182 F. Supp. 2d 81, 86-87 (D.D.C. 2002). While courts generally have applied Exemption 7(F) to protect law enforcement personnel or other specified third parties, by its terms, the exemption is not so limited; it may be invoked to protect "any individual" reasonably at risk of harm. 5 U.S.C. § 552(b)(7)(F).

The Department invokes Exemption 7(F) as yet another basis for withholding "program category" information for criminal matters in the investigative stage. And yet again, the Department principally relies on the same arguments it makes in support of withholding the information under Exemption 7(A). See Def. Combined Mem. (Long II) at 25-26. With respect to the "program category" information the Court has concluded is exempt from disclosure under Exemption 7(A), the Court will not consider whether such information also is exempt under Exemption 7(F).[35] With respect to all other "program category" information, the Court concludes that the Department has not shown that the entries are exempt under Exemption 7(F). The Department has failed to demonstrate with sufficient specificity that releasing such information reasonably could be expected to endanger the life or physical safety of any individual. Instead, it offers little more than conclusory assertions that disclosure will increase the chances that third

---

[35]    Accordingly, the Court does not address the effect, if any, of the holding in Center for National Studies on the Department's Exemption 7(F) claims with respect to the "project category" information that properly is withheld under Exemption 7(A).

parties will be harmed in some way. See Def. Reply (Long II) at 23. Such unsupported

speculation cannot serve as a justification for withholding information under Exemption 7(F).

See Smith v. Bureau of Alcohol, Tobacco and Firearms, 977 F. Supp. 496, 502 (D.D.C. 1997).

## H. Notice

Under the FOIA, if an agency determines that it cannot respond to a records

request within the statutory deadline of twenty working days, the agency may extend the deadline

"by written notice to the person making such request setting forth the unusual circumstances for

such extension and the date on which a determination is expected to be dispatched." 5 U.S.C.

§ 552(a)(6)(B)(i). If the agency seeks to extend the deadline beyond ten working days, the

agency also must provide the requester an opportunity either "to limit the scope of the request so

that it may be processed" within the original statutory deadline or "to arrange with the agency an

alternative time frame for processing the request or a modified request." 5 U.S.C.

§ 552(a)(6)(B)(ii). Moreover, the Department's regulations require the EOUSA to provide notice

of a deadline extension "as soon as practicable." 28 C.F.R. § 16.5(c).

In response to the FOIA requests TRAC submitted on April 3, 2000 and May 2,

2000, the EOUSA initially sent plaintiffs a "form letter," see Davis Decl. ¶¶ 45, 73, which reads,

in pertinent part:

> Your request will be placed in the order in which it was
> received for processing, unless it is a very large request (Project
> Request). Then, it will be placed in a separate group of Project
> Requests, which are also processed in the order received.
>
> EOUSA makes every effort to process most requests within
> a month (20 working days). There are some exceptions, for example,
> Project Requests take approximately nine months to process.

-66-

> Requests for "all information about myself in criminal case files" are
> Project Requests. If you have made such a request, you may either
> write us and narrow your request for specific items, or we will
> consider that you have agreed to a due date of nine months from the
> date of this letter.

Def. Mot. (Long I), Exhibits 22 & 27.[36]

Plaintiffs charge that the standard form notice issued by the EOUSA fails to

comply with the notice requirement of the FOIA and the Department's regulations because

(1) the notice fails to explain the reason for the delay or give an estimated date for response;

(2) a form notice – by definition – fails to provide "meaningful information"; and (3) the EOUSA

reasonably could not have concluded that plaintiffs consented to a nine-month delay. See Pl.

Combined Mem. (Long I) at 48-52.[37]

The Court disagrees. A fair reading of the form notice utilized by the EOUSA to

provide an initial response to FOIA requesters indicates that a "very large request (Project

Request)" will "take approximately nine months to process." E.g., Def. Mot. (Long I), Exhibit

22. Thus, the reason for delay is provided as the size of the request, and the date on which the

_____

[36]    The record reflects that the Department regularly – if not exclusively – responded
to TRAC requests with the identical form notice. See Def. Mot. (Long I), Exhibits 14, 15, 17,
22, 27.

[37]    The Second Amended Complaint, while not expressly addressing the
Department's form notice, generally alleges that the EOUSA has followed a pattern and practice
of not meeting the deadlines prescribed by the FOIA and not providing TRAC with the notice
required by the statute and Department regulations when it cannot process TRAC's requests
within those deadlines. Second Amended Complaint (Long I), Fourth Count. Because the
Department now has released all of the requested information for which it is not claiming an
exemption, plaintiffs' claims in this regard are moot with respect to the FOIA requests at issue in
this litigation. See Tijerina v. Walters, 821 F.2d at 799. Accordingly, the only live controversy
between the parties in connection with the Fourth Count of the Second Amended Complaint
(Long I) is the Department's practice of issuing the disputed form notice.

Department expects to respond to such requests is provided as nine months from the date the notice is issued. It also is far from unreasonable for the EOUSA to assume that requesters who submit very large requests and who do not contact the EOUSA to narrow their requests agree to a release date of nine months from the date of the notice. Here, the language of the notice is unambiguous: "If you have made [a Project Request], you may either write us and narrow your request for specific items, or we will consider that you have agreed to a due date of nine months from the date of this letter."

Plaintiffs' argument that the form notice fails to provide realistic or meaningful information is without merit. For example, plaintiffs note that the form notice does not define "very large requests." See Pl. Reply (Long I, 8/1/02) at 26 n.8. The notice does, however, provide a frame of reference for requesters by indicating that, for example, "[r]equests for all information about myself in criminal case files" constitute "Project Requests" which in turn are characterized as "very large request[s]." At the very least, requesters are put on notice that depending upon the size of their request, there may be a substantial delay in the Department's processing of the request.[38] Moreover, nothing in the notice prohibits requesters from contacting the EOUSA to clarify whether a request will take nine months to process. Plaintiffs also suggest that an anticipated delay of nine months cannot be a realistic estimate for all Project Requests. The Court agrees, but there is no evidence in the record indicating that nine months is not, in fact, a reasonable estimate "that corresponds to the average amount of time required to respond

---

[38]     On this point, the Department persuasively argues that TRAC cannot realistically doubt whether any of its past or future FOIA requests for case management data constitute Project Requests. See Def. Combined Mem. (Long I, 9/9/02) at 52 (noting that "[t]he smallest of Plaintiffs' requests for case management data – namely, their request for mid-year files – still encompassed several hundred thousand records").

to a Project Request." Def. Combined Mem. (Long I, 9/9/02) at 51. Furthermore, the use of an

initial form notice in no way precludes the EOUSA from providing a different estimate or

revising its original estimate when the situation warrants and/or in response to a telephone call or

letter from the requester – or from providing a reason for delay other than the size of the request.

In fact, the record demonstrates that the EOUSA on multiple occasions provided TRAC with

revised estimated response dates in response to specified circumstances. See, e.g., Def. Mot.

(Long I), Exhibits 20, 32.

Finally, and perhaps most importantly, the purpose of the notice requirement – as

plaintiffs acknowledge – is to allow requesters to determine whether they should narrow their

requests in order to receive the information more quickly. See Pl. Combined Mem. (Long I) at

51. Plaintiffs, however, do not allege that TRAC would have narrowed any request if the content

of the notices that they received had been different. Indeed, as the Department correctly points

out, plaintiffs also have not alleged – and there exists no evidence – that "individualized" notices

would have contained different estimated release dates than did the form notices. See

Defendant's Surreply, filed in Long I, Dec. 3, 2002 ("Def. Surreply (Long I)") at 6-7. In other

words, plaintiffs have failed to allege that TRAC has been injured in the past by the

Department's practice of issuing the form notice, and they have offered no evidence suggesting

that TRAC likely will be injured by the practice in the future.

In short, while the history of this litigation is filled with instances of delay and

missed deadlines on the part of the Department, the Court is not convinced that the Department's

practice of issuing the form notice in question contributed to those unfortunate occurrences.

*I. Fee Waiver*

As a general matter, there are three levels or limitations on charging fees in connection with FOIA requests. An agency may charge fees for the search, review and duplication of records if the records are requested for a commercial use. 5 U.S.C. § 552(a)(4)(A)(ii)(I). If the records are sought for a non-commercial use and the request is made by an educational or non-commercial, scientific institution or by a representative of the news media, an agency may charge fees only for duplication. 5 U.S.C. § 552(a)(4)(A)(ii)(II). In all other cases, an agency may charge fees for the search for and the duplication of records. 5 U.S.C. § 552(a)(4)(A)(ii)(III). In addition, the FOIA provides that documents shall be provided either at no charge or at a reduced charge if "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester." 5 U.S.C. § 552(a)(4)(A)(iii).

The FOIA also requires agencies to promulgate regulations with respect to the fees charged for requested materials. 5 U.S.C. §§ 552(a)(4)(A)(i) and (ii). The Department accordingly has promulgated regulations, found at 28 C.F.R. § 16.11(k), in order to aid its determination of whether to grant fee waivers.

In the FOIA requests at issue, TRAC has requested a full waiver of fees and classification as an educational institution or representative of the news media. As noted above, shortly after plaintiffs filed their initial complaint in Long I, the EOUSA, by letter dated March 21, 2000, requested that TRAC provide "any and all records for the previous five years regarding all fee schedules utilized by TRAC, and any and all records of any fees proposed, charged and/or

-70-

received by TRAC in the previous five years." Long Decl. (Long I), Exhibit 10. The EOUSA further requested "any and all records regarding the sources of funding for TRAC"; information on how TRAC publishes or disseminates FOIA-requested information to the public; an explanation of how TRAC contributes to the public's benefit; and "a supporting cost analysis including but not limited to the fees charged by TRAC and those received during the previous five years." Id. The asserted reason for the requests was to assist the EOUSA in determining whether TRAC qualified for a fee waiver and classification as a representative of the news media. See id.

By letters dated April 12, 2000 and May 15, 2000, plaintiffs submitted detailed information to the EOUSA in support of TRAC's request for a fee waiver and status classification. Pl. Mot. (Long I, 8/5/02), Exhibits 15 & 16. Plaintiffs informed the EOUSA on April 12, 2000, however, that TRAC would not provide all of the fee and financing records requested in the EOUSA's March 21, 2000 letter. See id., Exhibit 15 at 1. Subsequently, the Department has released all of the records that TRAC has requested – subject to various exemption claims, of course – without charging TRAC any fees. The Department has not rendered a determination as to whether TRAC qualifies as an educational institution or a representative of the news media. Def. Combined Mem. (Long I, 9/9/02) at 61.

Plaintiffs raise three challenges to the Department's processing of TRAC's request for a fee waiver and status determination. First, they allege that the Department's failure to render a formal determination on TRAC's request for a fee waiver "within a reasonable period of time" is "arbitrary and capricious" and constitutes a denial of the request, which the Court should review de novo. See Second Amended Complaint ¶ 68; Pl. Combined Mem. (Long I) at

-71-

53-55. Next, plaintiffs argue that the EOUSA's demand for "any and all" records pertaining to TRAC's fee schedules and funding sources over the prior five-year period violates Department regulations and threatens TRAC's relationship with supporters and subscribers. See Pl. Combined Mem. (Long I) at 53, 55-57, 61-63; Pl. Reply (Long I, 8/1/02) at 31-32; Seventh Long Decl. ¶¶ 37, 38. Finally, plaintiffs argue that the materials TRAC has submitted to the Department demonstrate that TRAC qualifies for reduced fees as both a representative of the news media and as an educational institution and because the records sought are not for commercial use. See Pl. Combined Mem. (Long I) at 58-61. Plaintiffs seek a declaration to that effect.

The Department responds that the Court lacks jurisdiction to consider any of the fee waiver issues raised by plaintiffs. Addressing plaintiffs' claims one by one, the Department first argues that the question of whether it impermissibly delayed issuing a determination on TRAC's fee waiver request is now moot because the Department has released the requested records without imposing a fee and, in any event, plaintiffs lack standing to bring this claim because they have alleged no injury. See Def. Combined Mem. (Long I, 9/9/02) at 52-55; Def. Combined Mem. (Long I, 7/31/02) at 65-68.

The Department similarly argues that plaintiffs lack standing to bring a claim challenging the EOUSA's request for information pertaining to TRAC's fee schedules and funding sources. But even if plaintiffs have standing, the Department maintains that the EOUSA did not violate Department regulations by sending the letter in question. See Def. Combined Mem. (Long I, 9/9/02) at 55-61; Def. Combined Mem. (Long I, 7/31/02) at 61-64. On the latter point, the Department asserts that while the relevant regulations do not require the provision of

the particular information requested by the EOUSA, nothing in the regulations expressly

prohibits such requests.  Def. Combined Mem. (Long I, 9/9/02) at 59-60.  In addition, the

Department references specific regulations that it contends authorize the EOUSA to request such

information.  Def. Combined Mem. (Long I, 7/31/02) at 62-63 (listing regulations).

Finally, relying on this Court's decision in Long v. Bureau of Alcohol, Tobacco

and Firearms, 964 F. Supp. 494 (D.D.C. 1997), the Department argues that because it has neither

imposed fees in connection with the requests at issue nor rendered a determination that TRAC

fails to qualify as an educational institution or representative of the news media under the FOIA,

plaintiffs' claims regarding its status are either moot – with respect to the instant requests – or

not ripe – with respect to future ones.  See Def. Combined Mem. (Long I, 9/9/02) at 61-62 (citing

Long v. Bureau of Alcohol, Tobacco and Firearms, 964 F. Supp. at 498.

Plaintiffs' primary reply is that their claims cannot be rendered moot by the

Department's de facto waiver of fees.  More precisely, they contend that the Department has been

careful to leave open the option of assessing fees for records that already have been released or

that may be released pending the outcome of this litigation.  See Pl. Reply (Long I, 8/1/02) at

28-29.  Plaintiffs also assert that their request for a declaration regarding their status is ripe for

decision because (1) the Department has not abandoned its position that it will not render a

determination unless TRAC provides the Department with information regarding its fee

schedules and funding sources; and (2) all of the materials TRAC submitted in support of its

request for a status determination are before the Court.  See id. at 29-32.

1. The Department's Delay in Processing TRAC's Fee Waiver Request

As an initial matter, the Court finds that the Department unequivocally has granted TRAC a full fee waiver in connection with the FOIA requests at issue in these consolidated cases. Not only has the Department released the requested records without imposing a fee, but it also has represented to the Court and to plaintiffs, in no uncertain terms, that the "EOUSA has waived any fees with respect to the FOIA requests at issue in this litigation." Def. Combined Mem. (Long I, 7/31/02) at 68. Accordingly, plaintiffs' claims regarding the Department's delay in processing TRAC's fee waiver request are moot. See Hall v. CIA, 437 F.3d 94, 99 (D.C. Cir. 2006); Better Gov't Ass'n v. Dep't of State, 780 F.2d at 91 ("Even assuming appellants' claims that they were improperly denied fee waivers were well-founded, we cannot order the appellee departments to do something they have already done, i.e., waive the FOIA fees in the instant cases."); Long v. Bureau of Alcohol, Tobacco and Firearms, 964 F. Supp. at 497-98.

2. TRAC's Status Under the Fee Waiver Provisions of the FOIA

Because the Court finds that TRAC has been granted a fee waiver, the Court also agrees with the Department that the question of TRAC's status as an "educational institution" or a "representative of the news media" under the FOIA is moot with regard to the FOIA requests at issue in this litigation. See Long v. Bureau of Alcohol, Tobacco and Firearms, 964 F. Supp. at 497-98. A status determination under the FOIA is significant only with regard to the assessment of fees. Once a fee waiver has been granted, neither the FOIA nor the Department's regulations

create an independent right to an adjudication of status. See id. at 498 ("A requester is entitled only to a fee waiver (where appropriate), not the incident status determination.").

The Court similarly concludes that the question of TRAC's status with respect to future FOIA requests is not ripe for adjudication. Evaluating questions of ripeness, the Court must consider "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." Abbott Labs. v. Gardner, 387 U.S. 136, 145 (1967); see Ciba-Geigy Corp. v. EPA, 801 F.2d 430, 434 (D.C. Cir. 1986). The inquiry as to fitness for review encompasses several factors, including whether the agency's action is sufficiently final, whether the issue presented is purely a legal one, and whether consideration of the issue would benefit from a more concrete setting. Ciba-Geigy Corp. v. EPA, 801 F.2d at 435. Although plaintiffs contend, with respect to the third factor, that the Court has before it a fully-developed record, the other two factors weigh heavily against them. The only final agency action that has been rendered is the grant of a fee waiver by the Department, which plaintiffs do not contest, and the question of TRAC's status under the fee waiver provisions of the FOIA requires a factual inquiry as well as a legal one. On balance, the Court finds that the question of TRAC's status is not fit for review at this time.

The Court also finds that TRAC will not suffer significant hardship if the Court withholds consideration of the question. While "a favorable status determination now may provide an advantage to [TRAC] upon a subsequent fee request, denial of such a determination does not preclude a favorable outcome in the future, not least of all because an entity's status can change." Long v. Bureau of Alcohol, Tobacco and Firearms, 964 F. Supp. at 498. In other words, "despite its potential usefulness, the status determination process does not give rise to an

-75-

independent entitlement." Id.  Accordingly, "[a]ny declaration of [TRAC's] status by the Court

at this time would be tantamount to an advisory opinion." Id.

### 3. The EOUSA's Request for Information from TRAC

Applying the same principles, the Court concludes that plaintiffs' challenges to

the EOUSA's request for information pertaining to TRAC's fee schedules and funding sources

are moot with regard to the instant FOIA requests and not ripe with regard to future ones.

Plaintiffs argue that the Department impermissibly has delayed determining TRAC's fee status

because TRAC has refused to provide the EOUSA with the information it has requested.  See Pl.

Combined Mem. (Long I) at 55.[39]  For the reasons stated above, however, the Department's

ultimate decision to grant TRAC's request for a fee waiver in connection with the FOIA requests

at issue in this litigation renders moot any claims that plaintiffs have asserted   including this one

– regarding the Department's delay in processing TRAC's fee waiver request as well as any

questions involving TRAC's status under the fee provisions of the FOIA.

While the question of whether the Court should consider the Department's legal

authority to request such information in the future is a much closer call, the Court nevertheless

concludes that the issue is not ripe for adjudication at this time.  Although the issue arguably is

one that is fit for review, the Court's conclusion is derived from the lack of any significant

hardship to TRAC of withholding a judicial determination, which tips the balance in favor of

---

[39]      Plaintiffs allege no other legally cognizable injury resulting from the EOUSA's
request for information.  Their assertion that TRAC's relationship with its supporters and
subscribers will be threatened by the EOUSA's actions is both vague and supported only by
speculation.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (plaintiffs must
allege an injury that is "concrete and particularized" and "actual and imminent, not conjectural or
speculative").

forbearance.  Perhaps most importantly in this regard, nothing in the record suggests that the

EOUSA's request has acted "to discourage FOIA requesters and impede access to information."

Better Gov't Ass'n v. Dep't of State, 780 F.2d at 94.  Not only is there no evidence that the

Department has withheld or delayed the release of information because TRAC has not provided

all of the requested fee and financing documentation, but there also is no indication that TRAC

has been discouraged from submitting FOIA requests.  To the contrary, in recent years TRAC has

filed FOIA requests with the EOUSA on at least a monthly basis.  See O'Rourke Decl. ¶ 18.

CONCLUSION

For the reasons stated in this Opinion, the Court denies as moot plaintiffs' first

motion for partial summary judgment filed in Long I.  The Court grants in part and denies in part

plaintiffs' second motion for partial summary judgement filed in Long I and plaintiffs' motion

for summary judgment filed in Long II.  The Court also grants in part and denies in part the

Department's motions for summary judgment filed in both Long I and Long II.  The Court will

issue this same date an Amended Order directing the Department to release specific categories of

records in accordance with this Opinion.

PAUL L. FRIEDMAN
United States District Judge

DATE: 9|8|06